KEKER, VAN NEST & PETERS LLP
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
BAILEY W. HEAPS - # 295870
bheaps@keker.com
CONNIE P. SUNG - # 304242
csung@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiff
ANGELO VICTOR RODRIGUEZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELO VICTOR RODRIGUEZ,<br><br>Plaintiff,<br><br>v.<br><br>BETH ZALNO, MICHAELEEN POWANDA, THOMAS CULLEN, RYAN PARKYN, CATRICIA HOWARD, KATHLEEN GOWER, FELICITAS FANDREYER, PHILLIP KAPATOS, BERHAN YEH, AND STEPHEN SPAULDING, *in their individual capacities*, MICHAEL CARVAJAL, *in his official capacity*, and DOES 1 - 99,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1389617

**INTRODUCTION**

1.      Plaintiff Angelo Victor Rodriguez is paralyzed from the waist down and confined to a wheelchair.  His condition necessitates access to certain medical equipment and physical therapy, or else Rodriguez faces the prospect of potentially life-threatening bedsores, painful contractures, and irreversible atrophy.  These requirements are well known to medical professionals and Rodriguez and his family reiterated them to the Federal Bureau of Prisons ("BOP") as soon as he began his term of confinement.  Yet every facility at which Rodriguez was housed ignored Rodriguez's most basic needs.  Rodriguez was denied physical therapy, forced into the Segregated Housing Unit ("SHU") for no fault of his own (where he was largely ignored), and left without critical wound care as his condition worsened.  Rodriguez's treatment by BOP personnel amounts to deliberate indifference to serious medical needs in violation of the Eighth Amendment to the United States Constitution.  Rodriguez must be made whole and the individuals who mistreated Rodriguez must be held to account.

2.      Rodriguez, a native San Franciscan, was paralyzed by a gunshot wound in 2010, at the age of 18.  Through hard work and with the assistance of his family, Rodriguez learned to adapt to his new reality and regained a measure of independence.

3.      After a lapse in judgment landed Rodriguez in BOP custody in 2017, Rodriguez's progress stalled and, in fact, regressed.  BOP officials repeatedly denied Rodriguez the care and equipment that he required, at every turn exhibiting deliberate indifference to Rodriguez's needs.

4.      Although Rodriguez and his family persistently informed BOP that he required physical therapy to prevent painful bedsores, contractures, and atrophy, Rodriguez was given no opportunity to participate in physical therapy at his first long-term stop in the BOP system, FCI Allenwood in White Deer, Pennsylvania.

5.      When Rodriguez was transferred to a Federal Medical Center, FMC Devens in Ayer, Massachusetts, ostensibly to access the care he was needed, he was placed in the SHU and again denied access to the physical therapy that was the very reason for his transfer.  As Rodriguez—still suffering from Post-Traumatic Stress Disorder ("PTSD") from the shooting that left him paralyzed—grew increasingly distressed about his placement in the SHU, he was coerced

1
COMPLAINT

1389617

into waiving any ongoing right to physical therapy as a condition of being moved elsewhere.

6. After Rodriguez begrudgingly signed a waiver of physical therapy, he was sent *back* to Allenwood, where, of course, he was again denied the medical care that he needed.

7. The results of BOP's neglect were predictable:  Rodriguez developed a dangerous bedsore and, as soon as he was sent back to San Francisco in early 2020 for the final six months of his 41-month term of imprisonment, Rodriguez was forced to spend two weeks in the hospital for treatment of a bedsore and life-threatening infection.  To this day, the wound from the bedsore requires ongoing care and Rodriguez suffers from painful contractures, permanently diminished mobility, and likely irreversible atrophy in his legs.

8. Rodriguez's misfortune was entirely avoidable.  Had he received even the base level of care required by an inmate in his condition, he could have served his sentence without incident.  But as a Court in this District previously observed, BOP "failed miserably in its obligations" to Rodriguez.  *See United States v. Rodriguez*, No. CR 17-00021-WHO (N.D. Cal.) (Orrick, J.), 1/23/20 Status Conf. Tr., at 14:9–10.

9. BOP's failure—and, more particularly, the deliberate indifference of numerous BOP employees and officials whose paths Rodriguez crossed in the course of his incarceration—runs afoul of the Eighth Amendment.  Rodriguez therefore brings this action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 *et seq.*

10. For these violations, Rodriguez seeks nominal, compensatory, and punitive damages, attorneys' fees and costs, and any other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

11. Rodriguez's claims arise under the United States Constitution and the laws of the United States, and thus the Court has federal question jurisdiction under 28 U.S.C. § 1331.

12. The Court also has personal jurisdiction over Defendants.  The Court has specific jurisdiction over Defendants because they undertook intentional acts directed at this District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.  In the

COMPLAINT

1389617

alternative, venue is proper under 28 U.S.C. § 1391(b)(3).

## INTRADISTRICT ASSIGNMENT

14.    Pursuant to Civil Local Rule 3-2(d), Rodriguez's action is properly assigned to the San Francisco Division of this District because a substantial part of the events or omissions which give rise to the claim occurred in San Francisco county, where Rodriguez resides.

## PARTIES

15.    Plaintiff Angelo Rodriguez is an individual and citizen of San Francisco.  During the relevant period, Rodriguez was incarcerated at various BOP facilities.  Rodriguez has now finished his term of imprisonment and again resides in San Francisco.

16.    Defendant Beth Zalno is an individual and, on information and belief, a citizen of Pennsylvania, where she is domiciled.  During the relevant period, Zalno worked at FCI Allenwood in White Deer, Pennsylvania.

17.    Defendant Michaeleen Powanda is an individual and, on information and belief, a citizen of Pennsylvania, where she is domiciled.  During the relevant period, Powanda worked at FCI Allenwood in White Deer, Pennsylvania.

18.    Defendant Thomas Cullen is an individual and, on information and belief, a citizen of Pennsylvania, where he is domiciled.  During the relevant period, Cullen worked at FCI Allenwood in White Deer, Pennsylvania.

19.    Defendant Ryan Parkyn is an individual and, on information and belief, a citizen of Pennsylvania, where he is domiciled.  During the relevant period, Parkyn worked at FCI Allenwood in White Deer, Pennsylvania.

20.    Defendant Catricia Howard is an individual and, on information and belief, a citizen of Pennsylvania, where she is domiciled.  During the relevant period, Howard worked at FCI Allenwood in White Deer, Pennsylvania.

21.    Defendant Kathleen Gower is an individual and, on information and belief, a citizen of Massachusetts, where she is domiciled.  During the relevant period, Gower worked at FMC Devens in Ayer, Massachusetts.

22.    Defendant Felicitas Fandreyer is an individual and, on information and belief, a

3

COMPLAINT

1389617

citizen of Massachusetts, where she is domiciled.  During the relevant period, Fandreyer worked at FMC Devens in Ayer, Massachusetts.

23.     Defendant Philip Kapatos is an individual and, on information and belief, a citizen of Massachusetts, where he is domiciled.  During the relevant period, Kapatos worked at FMC Devens in Ayer, Massachusetts.

24.     Defendant Berhan Yeh is an individual and, on information and belief, a citizen of Massachusetts, where he is domiciled.  During the relevant period, Yeh worked at FMC Devens in Ayer, Massachusetts.

25.     Defendant Stephen Spaulding is an individual and, on information and belief, a citizen of Massachusetts, where he is domiciled.  During the relevant period, Spaulding worked at FMC Devens in Ayer, Massachusetts.

26.     Defendant Michael Carvajal is an individual and, on information and belief, a citizen of Washington, D.C.  He serves as the Director of the Federal Bureau of Prisons.  He is sued in his official capacity.

27.     The true names and capacities of Defendants identified as DOES 1–99 are unknown to Rodriguez, and Rodriguez will amend this Complaint to insert the true names and capacities of those fictitiously named Defendants when their identities are ascertained.  On information and belief, each of the Defendants designated herein as a DOE is responsible, in some manner, for the events and happenings referred to and caused injury and damages thereby to Rodriguez.

## FACTUAL ALLEGATIONS

**A.     Rodriguez Is Paralyzed in a Shooting Prior to Incarceration.**

28.     Angelo Victor Rodriguez was born in San Francisco on February 21, 1992 to Suzanne Zelaya and Victor Rodriguez.  Rodriguez's parents split when Rodriguez was young and Zelaya assumed primary responsibility for raising Angelo and his brother, Anthony.  Victor Rodriguez was largely absent from his sons' lives following the divorce.

29.     Angelo Rodriguez nevertheless enjoyed a happy childhood.  He excelled in his youth at football and track.  He was an avid artist and drummer.  At Downtown High School,

4

COMPLAINT

1389617

Rodriguez received As and Bs and dreamed of joining the Army. Unfortunately, Rodriguez became involved at an early age in the Norteño street gang, which often recruited youths in the neighborhood where he grew up. He was arrested several times before turning 18.

30. In November 2010, as he was walking down the street in the Mission neighborhood of San Francisco, Rodriguez was approached by several gunmen and shot twice in the chest. As Rodriguez attempted to escape, his assailants shot at him at least twice more. Rodriguez was taken to the hospital, where he spent more than two weeks in a coma. When he awoke, Rodriguez learned that he had become paralyzed from the waist down. He had sustained T8/T9 vertebral body fractures with a bullet fragment lodged in the T9 canal, a rib fracture, and a sternal fracture, requiring multiple surgeries including a T6-T12 fusion. Rodriguez was ultimately forced to spend two months, beginning in early December 2010, at a rehabilitation center.

**B.       With the Help of Physical Therapy, Rodriguez Regains Independence.**

31. The years that followed were difficult for Rodriguez. His drastically altered physical condition requiring figuring out how to use a wheelchair and relearning basic skills like how to bathe and go to the bathroom. He quickly had to learn how to exercise and stretch his lower body to avoid additional lasting health challenges. Rodriguez's new normal necessitated constant care, including physical therapy, from health workers and family. Moreover, especially because his assailants were never caught or even identified, Rodriguez suffered from severe PTSD and required extensive mental health treatment.

32. The work put in by Rodriguez—with the help of his family and health care professionals—paid dividends, and in the years following his accident, Rodriguez, though paralyzed, had relatively normal range of motion in his legs. Physical therapy, both informally on his own and, even more so, with the assistance of a trained professional, proved instrumental in stabilizing Rodriguez's condition and helping him to achieve a measure of independence. Maintaining an exercise and physical therapy regimen was particularly important for avoiding the painful pressure sores that developed frequently in the first years after the injury and reducing spasms that likewise often plague paraplegic individuals.

1389617

33.    Doctors thus consistently directed that Rodriguez stick with physical therapy and continue to exercise.

34.    In April 2012, a physical therapist noted that Rodriguez "appears far below the functional level expected for an individual at his age 2 years s/p thoracic SCI.  Patient will benefit from Physical Therapy to address independence with transfers and mobility and improve functional strength and flexibility.  Prognosis is fair to good as patient has demonstrated fair follow through with previous therapy programs though currently appears motivated to participate and make positive changes."

35.    A doctor at the Spinal Cord Wellness Clinic at Kaiser also saw Mr. Rodriguez in 2012, noting that he "has good range of motion passively at the hips bilaterally, knees bilaterally within normal limits.  Bilat ankle, he is lacking maybe 3 degrees dorsiflexion to neutral, plantar flexion within normal limits."  To maintain his condition, the doctor directed Mr. Rodriguez to use a standing frame and complete range-of-motion exercises and stretching with the assistance of a physical therapist.

36.    Later care providers echoed the same advice.  For example, in an email exchange from January 2013, Mr. Rodriguez's physical therapist wrote, "I recommend daily range of motion and daily use of the standing frame to help reduce his spasms and improve flexibility and positioning. . . .  These recommendations are in agreement with the same range of motion recommendations made by Vallejo."  Similarly, in February 2013, Rodriguez's doctor observed that "[h]is caregiver does do daily stretching exercises 15 minutes three times a day with the patient three times a day.  When he does not do this then his spasms worsen and his range of mobility declines."

37.    In April 2013, Rodriguez's doctor noted that he was hoping to drive with hand assistance; was doing much better; was "[m]otivated" and "[h]as direction"; was "[a]voiding unfavorable social situations"; and "[h]oping to do welding job and pursue his art."  He elaborated: "Angelo is doing really well.  He is motivated.  His spirits are good.  His is transferring himself.  He has career aspirations.  Applauded all of this."

38.    Medical notes from April 2013 likewise reflect that Rodriguez had, at the time,

6

COMPLAINT

1389617

maintained "good range of motion passively at the hips bilaterally, knees bilaterally but very tight. At the ankles, he is lacking a few degrees maybe 3-5 dorsiflexion to neutral bilaterally." The notes also reflect that the doctors "encourage[d] him to do a range of motion stretching program, because he is very tight in his knees" and observed that he was receiving assistance from others to complete his exercises: "His primary caregiver is his brother Anthony. He also has 148 hours a month of attendant care."

39.     Rodriguez's improvement was not always steady, but, when his condition worsened, physical therapy and guided exercises proved invaluable. In January 2015, for instance, notes from Kaiser Vallejo reflect that Rodriguez sought assistance for "decreased range of motion (ROM), decreased muscle length, joint immobility and pain," which was "causing an impaired functional ability to change body position." Kaiser recommended a 12-week program wherein Rodriguez visited the facility once a week for manual therapy and therapeutic exercise, among other services. At the end of the year, follow up notes stated: "Angelo is doing great. Driving, transferring, working at [S.F.G.H.] counseling kids in violent injuries."

40.     Likewise, in February 2016 Rodriguez reported to his physician that he was suffering from severe, painful spasms in his legs. The notes reflect that to mitigate the tightness and spasticity, he was completing physical therapy. Rodriguez's brother, Anthony, assisted with Angelo's twice daily exercises, stretching, and transfers to a standing frame that he used to mitigate atrophy.

41.     In March 2016, a physician's assistant observed that Rodriguez was doing "very well," was "[s]elf sufficient," and "[g]oing to school."

**C.     Rodriguez Is Arrested and Sentenced to 41 Months in Custody.**

42.     Rodriguez was arrested in October 2016 and charged with a single count of 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm.

43.     Rodriguez pleaded guilty before Judge Orrick on April 20, 2017. In doing so, Rodriguez offered a statement accepting responsibility for his actions, explaining in part:

> I should not have carried or possessed a firearm. My offense comes from fear. I live in fear because of my PSTD disorder. I can never forget the day I was shot.

7

COMPLAINT

1389617

> The people who shot me made several attempts to finish me off.  I felt that was the only way to feel safe and protect myself.  I feel like I messed up and regret my actions.

44.    Rodriguez was ultimately sentenced in August 2017 to 41 months in prison followed by three years of supervised release.

45.    In the months prior to being taken into custody, Rodriguez's doctor observed that he was "[d]oing well"; "[e]xercising"; "[t]ransferring well"; had "[n]o ulcers"; "[n]o problems with self cath"; [g]etting good grades."  A nurse wrote that she had had a "[v]ery pleasant" visit with Rodriguez, who she said was "[i]ndependent with all ADL's and needs assistance with iADLs."  Rodriguez's nurse also observed that he "[a]ctively participates in physical therapy or home exercise program."

### D.    Moved Frequently Between Facilities, Rodriguez Is Denied Care Critical to His Health as a Paraplegic.

#### 1.    Rodriguez Informs BOP of His Treatment Needs.

46.    In the months after his sentencing, Rodriguez spent short stints in Santa Rita County Jail, Nevada Southern Detention Center, and FTC Oklahoma, before winding up at FCI El Reno in El Reno, Oklahoma in December 2017.

47.    From the outset, it was made very clear to Rodriguez that he would have to fight for even the most basic of accommodations.  Indeed, as he was transferred from the jail in Santa Rita into federal facilities, government personnel refused to aid Rodriguez in getting onto the airplane that would transport him, making him roll out of his wheelchair and scoot himself up a set of stairs and onto the plane with no assistance whatsoever.  The officials purportedly responsible for Rodriguez's safety stood by idly and laughed as Rodriguez struggled.  Rodriguez would later write:  "I was humiliated and treated like an animal.  I was made to crawl into the transport plane and crawl on the ground like a snake on to the bus. …  The U.S. Marshals laughed and offered no assistance."

48.    Nevertheless, from the start, Rodriguez was clear in communicating to the El Reno staff the basic level of care required by someone in his condition.  In a December 2017 inmate request to staff, Rodriguez explained:

8

1389617

"I need proper medical attention, I cant help or take care of myself. I need help in taking showers and bowl movements. At home I had a full time caregiver who helped me, and while in here I been suffering on a daily. The medical at this facility is not enough for my condition and needs. I need to be sent to a hospital, home, or a medical facility that could provide the actual medical help and attention I need daily. I fear for my health, safety, body, and mental state. I need help. Im scared for myself in many ways due to my medical condition, and feel nobody is taking my needs into consiteration. I have rights and special needs that need to be met. Its not right for me and my needs to be placed here without adiquat help 24/7 for my needs. Can someone please help me, it could be a life threatening or critical situation for me.

Since being here I have not been seen by a doctor and put in the hole. I need my medications three time a day and over here all they do is two times a day. Im not getting full supplies I need at once to last me. I need a special bed and mattress to prevent sores and extra pillow to place between my legs to prevent sores as well. I need my legs streached on a daily to prevent atrophy and my legs from being locked unable to move and help with my blood circulation, without that it could cause me to get them amputated or further medical complications. I need help with taking showers and have bowl movements. This facility does not offer any of that to help me. My needs need to be taken into consideration as well as my safty. I been in extream pain with my hip replacements, they feel like one is out of place as well as pain the metal holding my spine in place feels bent from falling trying to use the bathroom on my own. I havent had a bowl movement in ten days, and been hurting and feeling sick. I need help and a proper place to be housed for my needs.[1]

49.    Rodriguez reiterated these points in conversations with doctors and outside advocates with the Oklahoma Office of Disability Concerns also reminded the BOP early in Rodriguez's incarceration that he would require special care.

50.    As was often the case, however, Rodriguez's pleas for aid fell on deaf ears. In January 2018, Rodriguez began requesting to be transferred to a facility that could meet his needs. In a January 4, 2018, request, Rodriguez wrote:

I would like to be transferred to a medical hospital facility where I could get the right care, attention, supplies, and resources for my medical condition. Im a fully paralyzed person who has special daily needs, tasks, and help such as taking showers, cleaning up after bowl movements, leg exercises, physical therapy, and much more that I cant receive here in this facility. My health and body is important to me, I deserve to have the adiquit help I need. I fear for my safety

---

[1] Quotations appear in the complaint as they do in the original source, without alteration, except where explicitly shown, of any spelling or grammatical errors.

9

COMPLAINT

1389617

and health.  Its not human to let someone suffer without the proper medical attention Im entitled to receive.  Could someone please help me and take my medical circumstances in to deep consideration, I cant take care of myself I need help.

51.     Rodriguez reiterated his demand on January 6, 2018 and January 7, 2018.  In the latter request, he again made clear that he needed regular assistance:

I NEED TO GET MY LEGS STREACHED AT LEAST ONCE DAILY TO PREVENT FURTHER ATROPHY, AND FOR BLOOD FLOW SO I DON'T GET BLOOD CLOTS AND HAVE TO GET AMPUTATION.  I have a lot of needs and help on a daily.  Im not receiving and neglecting them.  If you cant help or provide me with all the help I need daily like leg exercises, my meds 3x a day, showering, cleaning after bowl movements, and more, the I would like to be sent to a hospital facility that can take proper care of my medical needs.

52.     BOP's lack of regard for Rodriguez's condition had exactly the effect of which Rodriguez had warned.  On January 12, 2018, Rodriguez informed facility staff that he "is having breakdown on both my legs"; medical personnel then reported that "inmate does have multiple open lesions on both legs on the dorsal aspect of the thighs.  Lesions range in size from pin pricks to pencil eraser size and several appear to be oozing."

53.     Eventually, on January 26, a doctor informed Rodriguez that he would be transferred and put in for a physical therapy evaluation.

### 2.     Although Relocated to FCI Allenwood, Rodriguez Is Still Denied Care.

54.     After months of delay, Rodriguez was finally transferred to FCI Allenwood in March 2018.  Upon arrival, he was examined by Dr. Thomas Cullen, D.O., and Beth Zalno, PA-C.  Dr. Cullen recognized that Rodriguez would need to be monitored for wounds and ulcers.

55.     Eventually, Rodriguez was seen by an independent physical therapist, Susan Andrews, PT, MSPT, on August 8, 2018.  Andrews prepared a summary of her encounter with Rodriguez that explained that he "report[ed] that since being incarcerated he has had difficulty carrying out all of his rehab independently, as much of it is very difficult or impossible to do without the assistance of a therapist for safety and/or skilled movement facilitation."  Rodriguez told Andrews that "the atrophy in his legs has advanced over the last year and he now has difficulty getting full knee extension, even passively.  His goal is to work his way up to safe and

1389617

independent use of a walker for transfers, as he believes that this will significantly decrease his risk of falls and further injury during future transfers." Andrews added that "[t]here is moderate atrophy through his legs."

56. In her assessment, Andrews recognized that Rodriguez was "quite motivated to continue his efforts to regain more independent mobility, but is frustrated with the obstacles he faces currently in the absence of therapists to assist with rehab at consistent and regular intervals." In Andrews' estimation, Rodriguez's "age and overall level of fitness, coupled with his motivation, create very high potential for success with increased safety for transfers, as well as increased independent mobility with the use of [Knee Ankle Foot Orthoses ("KAFOs")], provided that he is provided the opportunity for hands on and skilled rehab services (vs. independent exercise and rehab activities without the assistance or input of a trained, skilled therapist)."

57. Andrews thus "suggest[ed] well-fitted KAFOs, and any very regular follow ups with fitting, as well as skilled, hands-on rehab," which she recognized "cannot be done in the FCI Allenwood setting with the current available services." She further observed that "incarceration in a setting where these services are readily available might offer him the access to these services and ultimately increased mobility." Physical therapy at Allenwood, on the other hand, was "not necessary or recommended at this point, as intermittent (1x/month) will not offer any long term benefit."

58. Andrews forwarded her report to BOP. A BOP Administrative Note stated that Andrews' "[f]indings were of the overall ability to rehabilitate physically with PT hand on guidance with KAFOs, properly fitted KAFOs, and ability to progress without these available is unlikely at ALM." The BOP Administrative Note stated that Andrews' "recommendations also included transfer to a medical facility where [hands on and skilled rehab] services would be readily available and ultimately increase mobility."

59. Furnished with Andrews' recommendation—which reiterated what Rodriguez had long known and communicated to BOP many times over—Rodriguez initiated the administrative grievance process to compel a transfer consistent with Andrews' guidance. In an informal resolution form completed on August 13, 2018, Rodriguez explained that "Im being neglected by

11

COMPLAINT

1389617

medical . . . by not receiving the proper daily medical care Im in need of" and that he required a transfer to obtain the care Andrews had prescribed. "Im deteriorating slowly due to the neglect of my needs not being met," he wrote.

60.    Rodriguez stated much the same in his subsequent Regional Administrative Remedy Appeal form, specifying that he needed to be housed in a "Care Level 4 FMC that can properly accommodate all my medical needs." And in an additional Request for Administrative Remedy, dated August 22, 2018, Rodriguez lamented that his transfer to a properly equipped medical center was taking so long, again reminding the prison staff that he was not receiving "needed equipment," such as a standing frame, recumbent bike, and leg braces, and certainly was not receiving the physical therapy he required.

61.    Warden Catricia L. Howard denied Rodriguez's Request for Administrative Remedy on September 12, 2018, informing Rodriguez that, following his August physical therapy evaluation, "a transfer request was submitted to Medical Designations, and is currently pending review and decision. Once a decision has been made by Medical Designations, you will be notified."

62.    Despite Howard's reassurances, no decision was forthcoming. An appeal to the BOP Regional Director, J. Ray Ormond, had little apparent effect. Nor did submitting a Central Office Administrative Remedy Appeal on October 9, 2018 result in any meaningful change. Neither the services Rodriguez required, nor a transfer, followed.

63.    Meanwhile, on September 26, 2018, Rodriguez reported to Zalno that he was having leg spasms. That same day, Zalno documented that Rodriguez "reports increased atrophy along with decreased range of motion in lower extremities since incarceration" and ordered a physiatrist examination "to determine if he has a complete or incomplete spinal cord injury and to determine if he has any potential or need from physical or occupational therapy."

64.    On October 24, 2018, Dr. Melissa Michaluk, a doctor specializing in physical medicine and rehabilitation at the UPMC Susquehanna specialty spinal cord injury clinic, conducted a physical examination of Rodriguez.

65.    Michaluk added to the growing chorus of healthcare professionals who had

12

COMPLAINT

1389617

observed that Rodriguez was not receiving the basic care his condition mandated.

66.     In recounting the physical challenges Rodriguez had faced, Michaluk observed that "[p]atient also has complications of spasticity that have been greatly improved with the use of a standing frame on a daily basis."  She recounted that "[w]ithin time after his initial spinal cord injury, he became motivated to where he did physical therapy and occupational therapy on a daily basis."

67.     Michaluk then explained that Rodriguez "has noticed since his imprisonment in the Allenwood federal prison, he has lost significant range of motion of the lower extremities, and has gained quite a bit of spasticity secondary to lack of therapies.  In addition, because he is not able to stand in a standing frame on a daily basis he is experiencing increasing neuropathic pain in the lower extremities."

68.     In her assessment and plan, Michaluk wrote that, *before* his incarceration, Rodriguez "had ample access to therapeutic equipment, a standing frame, wheelchair vendors, and a gym."  But, by the time of her examination, Rodriguez was "experiencing worsening spasticity and tightness due to lack of movement, range of motion, and stretching.   If patient could have access to these services, his risk for worsening spasticity, nerve pain, and permanent loss of the ability to stand would decrease significantly."  Michaluk added that, "[i]f patient had access to a standing frame where he would be able to stand and stretch for at least 30 minutes daily, his neuropathic pain would decrease significantly."  Dr. Cullen subsequently reviewed Michaluk's assessment.

69.     Finally, in November, after yet another request by Rodriguez, BOP's Administrator of National Inmate Appeals provided a response to Rodriguez's Central Office Administrative Remedy Appeal, stating that Rodriguez had been approved for transfer to a facility for continuation of his medical care.

### 3.     Rodriguez Is Transferred to FMC Devens, but Care Does Not Improve.

70.     Rodriguez arrived at FMC Devens in December 2018.  FMC Devens is a Care Level 4 facility.

1389617

71. Rodriguez was immediately placed in the SHU for 23 hours per day and given no indication of when he would be moved to the general population. Rodriguez's placement in the SHU was for no fault of his own: unbeknownst to Rodriguez until his arrival at the facility, the inmate population at FMC Devens was dominated by members of a gang that rivaled the gang to which Rodriguez had once belonged.

72. Rodriguez's cell in the SHU was not handicap-accessible. The only available bathroom to Rodriguez was not equipped for wheelchair use. Rodriguez fell repeatedly while trying to use the toilet. Rodriguez was unable to use the shower at all and was thus forced to go months without showering.

73. Rodriguez asked Kathleen Gower, his unit manager, to be moved to a handicap-accessible cell. Rodriguez repeatedly told Gower that he needed a shower, but Gower informed him that no handicap-accessible cell was available for his use.

74. Rodriguez was denied physical therapy and access to exercise equipment while housed in the SHU. Because of the size of Rodriguez's cell, Rodriguez was unable to independently perform exercises that had been a part of his regular regimen, including upper body strengthening exercises.

75. Rodriguez grew progressively more anxious and frustrated about his housing placement. By December 29, prison records noted that "Inmate is pending transfer to another facility commensurate with his security and housing needs," but it would be months before a transfer in fact took place.

76. Mr. Rodriguez, who has struggled with PTSD and depression, begged to leave the SHU. In a handwritten note of early January 2019, he "request[ed] to get my care level dropped to a '3' or '2' please[,]" abandoning his long-sought-after physical therapy request, as "[i]t ma[de] no sense having me at a medical center if Im not able to be on the compound. . . . Im not trying to be stuck in the SHU, Im trying to be at a facility that I can be at in general population and stay busy. Its unhealthy to keep me back here in my mental state of mind for no reason. Its clearly a form of abuse and neglect. Im not in trouble, so I should not have to be treated like I am. . . . please help me get to a facility that I can be at. . . . Its not right or fair Im being held in

14

COMPLAINT

1389617

the SHU.  When can I get out of here?  How much longer?  I truly cant take it no more, please help me."

77.     Rodriguez's urgent pleas and request to drop his care level were still not enough. Rather, Felicitas Fandreyer, FNP, a BOP medical practitioner, told him that, unless he waived his right to medical care—specifically, physical therapy for rehabilitation—he would remain in isolation.  Desperate and in deteriorating physical and mental health, on January 4, 2019, Rodriguez signed the waiver form.  The waiver was also signed by Fandreyer.

78.     On January 8, 2019, growing increasingly distressed, Rodriguez penned a handwritten "Cop Out" imploring the prison to drop his care level so that he could be moved to a different facility.  He wrote: "I just want to get out of the SHU ASAP."  Rodriguez communicated the same to Fandreyer a day later, telling her, "I'm going to lose it."

79.     On January 14, 2019, Berhan Yeh, MD/CD, ordered an urgent physical therapy consult request.

80.     Philip Kapatos, PT/DPT met with Rodriguez on January 16, 2019, and provided BOP with justification for denying Rodriguez the care he'd repeatedly requested.

81.     Rodriguez told Kapatos he was experiencing "nearly constant mid-back pain" as well as "frequent LE muscle spasms," attributing much of his decline to his time in the SHU.

82.     Rodriguez also told Kapatos that he still wanted and needed physical therapy, but had signed the waiver form because he believed that was the only way he could get out of the SHU.

83.     Nevertheless, Kapatos' report opined that Rodriguez "does not want PT treatment" and concluded "[n]o ongoing skilled PT is required."  Dr. Yeh reviewed Kapatos' report on January 17, 2019.

84.     Dr. Yeh completed a Medical Discharge Summary on January 17, 2019.  He explained that, "[p]rior to his incarceration, [Rodriguez] reports that he had been going to a PT clinic, not necessarily for ongoing PT treatment, but rather to use the exercise equipment . . . . He was sent to FMC Devens for PT evaluation and assessment for possible PT and Rehab from his spinal injury."  Dr. Yeh then reported that Rodriguez had arrived at FMC Devens on December 6,

15

COMPLAINT

1389617

2018, but that for "security reasons," Rodriguez "has been housed in the SHU since his arrival." Yeh asserted that "[t]here is no indication for PT given [Rodriguez's] absent prognosis for returning to functional ambulation," suggesting instead that Rodriguez "[c]ontinue with home exercises to maintain conditioning and function."

85.     All the while, Rodriguez continued to struggle.  On January 21, 2019, Rodriguez reported that he had fallen while trying to transfer from the bed to his wheelchair and was experiencing pain in his back.

86.     Rodriguez prepared a Compassionate Release Request on January 30, 2019.  He wrote that he had "been transferred to 8 different BOP facilities in 485 days and I have yet to receive the assured care for my health from any of these facilities."  He added:

> The continuous medical neglect, mistreatment, my life has been placed at risk, non wheelchair accessibility environment and failure to care for a paraplegic.  As of 1/18/19, it has been 487 days without receiving any physical therapy.  I have not showered since my arrival at FMC Deven (12/6/18).  Atrophy has begun to set in to the bones of my legs, which causes excruciating pain throughout my body.  Atrophy is irreversible."  Rodriguez explained that, while the prison system may have thought he was being transferred for surgery, "My transfer to FMC Deven is for physical therapy.  I finally reached a Federal Medical Center and I am immediately housed in the SHU.  You cannot even imagine my frustration and disappointment in the BOP system.  My journey has been too long and painful to be denied medical care.

87.     As for the withdrawal of his request for physical therapy, Rodriguez wrote that "I also was made or manipulated to sign a form to cancel my desperately needed physical therapy. . . . I have no concept of time or date, but a woman's voice informed me to sign the cancellation form for physical therapy, in order lower my care level.  By doing so, it will get me transferred to another facility.  She stated only inmates in the medical unit can receive physical therapy, [redacted].  I physical can no longer endure the pain of atrophy or be neglected at another facility. I am a human being with a disability with daily needs to survive."

88.     With Rodriguez's claim to physical therapy withdrawn, he was cleared to be transferred.  Even after executing the waiver in early January 2019, however, Rodriguez— inexplicably—languished in the SHU at Devens for two more months.  BOP again avoided providing Rodriguez the care he needed and instead passed the buck to Rodriguez's next stop.

16
COMPLAINT

**4.    Rodriguez's Health Deteriorates upon His Return to Allenwood.**

89.    Rodriguez was returned to FCI Allenwood in March 2019.

90.    Rodriguez again requested compassionate release on March 21, 2019.

91.    A March 25, 2019 report from Dr. Cullen claimed that Rodriguez would not require physical therapy based on the fact that FMC Devens had purportedly so concluded—ignoring entirely what had happened to Rodriguez while housed there.  Cullen either ignored or chose not to find out what had actually occurred.

92.    Denying Rodriguez's compassionate release request on April 2, 2019, Warden Howard wrote that "the Health Services personnel have confirmed that though you are a paraplegic, you continue to independently perform activities of daily living."  She continued: "A review of your medical file indicates that you were released from FMC Devens due to your documented refusal to participate in Physical Therapy.  This refusal was documented on January 4, 2019, and signed by the health care providers and you.  On January 16, 2019, the FMC Devens Physical Therapist examined you.  The results of this examination was reviewed by the Physical Therapist and the attending physician.  You were determined to be completely independent with all Activities of Daily Living (ADL's).  . . . There is no indication for additional Physical Therapy given your absent prognosis for returning to functional ambulation.  All your chronic impairments are stable and can be managed through basic self performed home exercises.  There is nothing in your medical records indicating your affiliation with a gang affiliation influenced your medical plan as you suggest."

93.    Although Rodriguez's condition continued to deteriorate through the latter half of 2019, with pain returning and mobility declining, BOP continued to whitewash its failure to provide Rodriguez with the basic care he needed.

94.    For example, Rodriguez was seen on November 5, 2019, by Andrews, who had previously concluded that he required physical therapy, only this time she did an about-face.  Andrews recognized that Rodriguez "[r]eports that since returning to FCI Allenwood, the spasms in his legs have progressed, and frequently cause his legs to lock in an extended position when he is attempting to transfer.  . . . This makes transfers into bed difficult, but also makes transfers into

17

1389617

and out of the shower difficult.  Morning ADLs are often slowed and interrupted by more significant spasms . . . ."

95.    Yet Andrews concluded that "[e]ven without any significant hands-on or skilled therapy services at FMC Devens, Mr. Rodriguez's overall status has changed very little since my first encounter with him, indicating a level of stability with the chronic issues related to his SCI."

96.    BOP continued its refusal to authorize physical therapy and equipment, and it failed to provide sufficient medical care as Rodriguez's health declined.  Through the fall of 2019, Rodriguez's contractures worsened, and his bedsores became infected.

97.    Throughout Rodriguez's second stint at Allenwood, he and his mother repeatedly raised their concerns over the care Rodriguez was receiving (or lack thereof) with Ryan Parkyn, an Assistant Health Services Administrator.  Though empowered to address Rodriguez's concerns, Parkyn failed to act appropriately, delaying and/or denying repeated requests for necessary durable medical equipment and physical therapy.

98.    Additionally, Rodriguez showed his infected bedsore to Michaeleen Powanda, PA, who dismissed it as trivial.  Powanda refused to seek an evaluation of a wound care specialist, and she refused to prescribe Rodriguez with antibiotics, even when Rodriguez's bedsore reeked of a pungent odor.

99.    Prison officials and employees, including at least Parkyn, Powanda, and Cullen, ignored Rodriguez's deteriorating state.  Parkyn, in particular, assured Rodriguez's mother that he was receiving all the care that he needed for the bedsores, but failed to ensure that that was so.  Allenwood medical staff did not adequately monitor Rodriguez's condition, used sink water to wash his wounds, and, most egregiously, never prescribed him antibiotics as he fell gravely ill.

100.    Instead, Allenwood personnel allowed Rodriguez's wound to fester through the end of his stay at the facility.  As their counterparts at Devens had done, the staff at Allenwood chose to ignore Rodriguez's problems and leave them for his next caretakers, this time in San Francisco.

**E.    Rodriguez's Condition Worsens When He Returns to San Francisco.**

101.    On January 14, 2020, Rodriguez left FCI Allenwood and reported to a halfway

18

COMPLAINT

1389617

house in San Francisco to continue his term in BOP custody. The halfway house, however, immediately sent Rodriguez to the hospital due to his dire condition: a bacterial infection had hollowed a four-inch cutaneous lesion in Rodriguez's right thigh tissue, and he had developed life-threatening sepsis.

102. Upon arriving to Saint Francis Memorial Hospital, Rodriguez reported that "I have a pressure sore on the bottom of my right cheek for months, but now it's worse. I'm having chills, hot flashes, I've thrown up, and the color looks worse." The sore had been there for four months, oozing with greenish drainage. The hospital files reflected that "[p]atient has been seen by the prison in Pennsylvania medical provider but no antibiotics given. He says that he was only getting ABD pad. . . . Upon arrival patient is febrile, work up shows leukocytosis with left shift and elevated ESR."

103. A physical examination conducted at the time revealed a right buttock decubitus ulcer that had become infected. Doctors noted that fixing the wound may require surgery.

104. A surgeon had to clean out the sore, and Rodriguez was put on intravenous antibiotics for the next two weeks.

105. Rodriguez was not discharged from Saint Francis until January 28, when he returned to the Central Gardens Nursing Facility until beginning a period of home confinement.

106. Rodriguez's prison term ultimately concluded on July 6, 2020, and he was released from BOP custody on that date.

107. Rodriguez's mobility has permanently declined as a result of BOP's failure to provide physical therapy or assistive equipment for over two years. Rodriguez faces the prospect of additional wound flap surgery to fix the ulcer that developed in early 2020. Rodriguez requires extensive continuing physical therapy to treat the injuries that developed and intensified under BOP's watch.

108. Even upon his release from St. Francis, initially to Central Gardens and ultimately back to his family home, Rodriguez continued to struggle with his painful condition. His contractures have grown progressively worse and his atrophy has advanced. He can no longer straighten his legs the way he once could. Rodriguez suffers from heightened PTSD, depression,

and anxiety.

## CLAIMS FOR RELIEF

### CLAIM ONE
### EIGHTH AMENDMENT, CRUEL AND UNUSUAL PUNISHMENT – DELIBERATE INDIFERENCE TO SERIOUS MEDICAL NEED
### (Against Defendants ZALNO, POWANDA, CULLEN, PARKYN, and HOWARD)

109.    Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

110.    Rodriguez brings this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, against Defendants Zalno, Powanda, Cullen, Parkyn, and Howard in their individual capacities.

111.    Under the Eighth Amendment to the U.S Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

112.    At all material times, Defendants Zalno, Powanda, Cullen, Parkyn, and Howard were federal employees of the BOP at FCI-Allenwood, acting under color of federal authority with respect to the allegations in this Complaint.

113.    Throughout Rodriguez's time at Allenwood during his custody in BOP, Defendants Zalno, Powanda, Cullen, Parkyn, and Howard repeatedly ignored or refused Rodriguez's requests for physical therapy and durable medical equipment, despite Rodriguez having received multiple medical recommendations, while Rodriguez was in BOP custody, for such treatment and equipment.

114.    The acts omissions of Defendants Zalno, Powanda, Cullen, Parkyn, and Howard, including the failure to provide adequate medical care for Rodriguez in light of his paraplegia, demonstrate deliberate indifference to Rodriguez's serious medical needs and constitute cruel and unusual punishment.

////

////

////

////

20

COMPLAINT

1389617

**CLAIM TWO**
**EIGHTH AMENDMENT, CRUEL AND UNUSUAL PUNISHMENT – DELIBERATE INDIFERENCE TO SERIOUS MEDICAL NEED**
**(Against Defendants GOWER, FANDREYER, KAPATOS, YEH, and SPAULDING)**

115.    Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

116.    Rodriguez brings this claim under the Cruel and Unusual Punishment Clause of the Eighth Amendment to the U.S. Constitution, against Defendants Gower, Fandreyer, Kapatos, Yeh, and Spaulding in their individual capacities.

117.    Under the Eighth Amendment to the U.S Constitution, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

118.    At all material times, Defendants Gower, Fandreyer, Kapatos, Yeh, and Spaulding were federal employees of the BOP at FMC-Devens, acting under color of federal authority with respect to the allegations in this Complaint.

119.    Defendants Gower, Fandreyer, Kapatos, Yeh, and Spaulding repeatedly ignored or refused Rodriguez's requests for physical therapy and durable medical equipment, despite Rodriguez having received multiple medical recommendations, while Rodriguez was in BOP custody, for such treatment and equipment.

120.    Defendants Gower, Fandreyer, Kapatos, Yeh, and Spaulding repeatedly ignored or refused Rodriguez's requests to be released from the SHU, where Rodriguez had little mobility and nearly no access to basic hygiene, and where Rodriguez's mental health was deteriorating rapidly.

121.    The acts omissions of Defendants Gower, Fandreyer, Kapatos, Yeh, and Spaulding, including the failure to provide adequate medical care for Rodriguez in light of his paraplegia and his PTSD, demonstrate deliberate indifference to Rodriguez's serious medical needs and constitute cruel and unusual punishment.

////

////

////

21

COMPLAINT

1389617

## CLAIM THREE
### REHABILITATION ACT, § 504
### DISCRIMINATION ON THE BASIS OF A DISABLIITY
(Against Defendant CARVAJAL)

122.    Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

123.    The Rehabilitation Act of 1983, 29 U.S.C. §§ 794 *et seq.* provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ."

124.    Rodriguez is paraplegic and, as such, is a qualified individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(20).

125.    Rodriguez is otherwise qualified to receive informed medical treatment and communicate with medical providers on an equal basis with other prisoners in the BOP, and is eligible to participate in commensurate educational, rehabilitative, and vocational services, and all other services provided to others at a given BOP facility.

126.    The BOP is an executive agency within the meaning of 29 U.S.C. § 794(a).

127.    Defendant Carvajal is the Director of BOP.  He is named as a defendant in his official capacity.

128.    Upon Rodriguez's arrival at FMC Devens on or around December 6, 2018, Rodriguez was immediately placed in the SHU, ostensibly for his own safety.  Rodriguez was housed in the SHU for the entire three-month duration of his custody at Devens.

129.    Rodriguez's cell in the SHU was not handicap-accessible.  The only available bathroom to Rodriguez was not equipped for wheelchair use.  Rodriguez fell repeatedly while trying to use the toilet.  Rodriguez was unable to use the shower at all, so he was forced to go months without showering.

130.    Rodriguez asked BOP employees, including his unit manager, to be moved to a handicap-accessible cell.  Rodriguez repeatedly told BOP employees that he needed a shower, but

COMPLAINT

1389617

he was informed that no handicap-accessible cell was available for his use.

131.    Defendants discriminated against Rodriguez on account of his paraplegia, by assigning Rodriguez to a non-handicapped cell where Rodriguez was unable to access basic amenities, such as the toilet or shower.  The acts and omissions of BOP discriminated against Rodriguez by failing to provide reasonable accommodation and denying him access to services and activities which are available to the able-bodied inmate population.

## DEMAND FOR JURY TRIAL

Rodriguez demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Rodriguez prays that this Court grant the following relief:

1.    Nominal damages in an amount to be determined at trial;

2.    Compensatory damages for injuries caused by a violation of his constitutional rights and personal dignity, physical injury, pain, discomfort, fears, anxiety, and other mental and emotional distress suffered by Rodriguez and for similar suffering reasonably certain to be experienced in the future, in an amount to be determined at trial;

3.    Punitive damages for malice, oppression, and reckless and callous disregard of Rodriguez's rights;

4.    An award to Rodriguez of reasonable costs and fees; and,

5.    Such other and further relief as the Court may deem fit and proper.

Dated:  August 12, 2020                                 KEKER, VAN NEST & PETERS LLP


                                                        By:    *s/Bailey W. Heaps*
                                                               R. ADAM LAURIDSEN
                                                               BAILEY W. HEAPS
                                                               CONNIE P. SUNG

                                                               Attorneys for Plaintiff
                                                               ANGELO VICTOR RODRIGUEZ

23

COMPLAINT

1389617