KEKER, VAN NEST & PETERS LLP
R. ADAM LAURIDSEN - # 243780
alauridsen@keker.com
BAILEY W. HEAPS - # 295870
bheaps@keker.com
CONNIE P. SUNG - # 304242
csung@keker.com
BILAL MALIK - # 318767
bmalik@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

Attorneys for Plaintiff
ANGELO VICTOR RODRIGUEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ANGELO VICTOR RODRIGUEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 3:20-cv-05614-WHA<br><br>**FIRST AMENDED COMPLAINT**<br><br>Dept.:      Courtroom 12 – 19th Floor<br>Judge:      Hon. William H. Alsup<br><br>Date Filed:  August 12, 2020<br><br>Trial Date:  None Set |

FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.    Plaintiff Angelo Victor Rodriguez ("Rodriguez") is paralyzed from the waist down and confined to a wheelchair.  His condition necessitates access to certain medical equipment and physical therapy, or else Rodriguez faces the prospect of potentially life-threatening bedsores, painful contractures, and irreversible atrophy.  These requirements are well known to medical professionals, and Rodriguez and his family reiterated them to the Federal Bureau of Prisons ("BOP") as soon as he began his term of confinement.  Yet every BOP facility at which Rodriguez was housed ignored his most basic needs.  Rodriguez was denied physical therapy, forced into the Segregated Housing Unit ("SHU") for no fault of his own (where he was largely ignored), and left without critical wound care as his condition worsened.  The injuries suffered by Rodriguez as a result of BOP's negligence and medical malpractice, including the injuries he continues to suffer today, were foreseeable and entirely avoidable.  Rodriguez must therefore be made whole and defendant United States of America ("United States") must be held to account for the tortious conduct of its employees.

2.    Rodriguez, a native San Franciscan, was paralyzed by a gunshot wound in 2010, at the age of 18.  Through hard work and with the assistance of his family, Rodriguez learned to adapt to his new reality and regained a measure of independence.

3.    After a lapse in judgment landed Rodriguez in BOP custody in 2017, his progress stalled and, in fact, regressed.  While he was incarcerated, BOP officials repeatedly denied Rodriguez the care and equipment that he required.

4.    Although Rodriguez and his family persistently informed BOP that he required physical therapy to prevent bedsores, contractures, and atrophy, Rodriguez was given no opportunity to participate in physical therapy at his first long-term stop in the BOP system, Federal Correctional Institution, Allenwood ("FCI Allenwood) in White Deer, Pennsylvania.

5.    When Rodriguez was transferred to Federal Medical Center, Devens ("FMC Devens") in Ayer, Massachusetts, ostensibly to access the care he needed, he was immediately placed in the SHU and again denied access to the physical therapy that was the very reason for his transfer.  As Rodriguez—still suffering from Post-Traumatic Stress Disorder ("PTSD") from the

1

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

shooting that left him paralyzed—grew increasingly distressed about his placement in the SHU, he was coerced into waiving any ongoing right to physical therapy as a condition of being moved elsewhere.

6. After Rodriguez begrudgingly signed a waiver of medical treatment, he was sent *back* to FCI Allenwood, where, of course, he was again denied the medical care and treatment that he needed.

7. The results of BOP's neglect were predictable: Rodriguez developed a dangerous bedsore and, as soon as he was sent back to San Francisco in early 2020 for the final six months of his 41-month term of imprisonment, Rodriguez was forced to spend two weeks in the hospital for treatment of the bedsore and a life-threatening infection. To this day, the wound from the bedsore requires ongoing care and Rodriguez suffers from painful contractures, permanently diminished mobility, and likely irreversible atrophy in his legs.

8. Rodriguez's misfortune was entirely avoidable. Had he received even the base level of care required for an inmate in his condition, he could have served his sentence without incident. But as a Court in this District previously observed, BOP "failed miserably in its obligations" to Rodriguez. *See United States v. Rodriguez*, No. 17-cr-00021-WHO (N.D. Cal.) (Orrick, J.), 1/23/20 Status Conf. Tr., at 14:9–10.

9. Rodriguez brings this civil action to vindicate BOP's repeated failures to provide him with the medical care that his paraplegia necessitated. Specifically, he asserts claims against defendant United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680 ("FTCA"), for various claims based on the tortious conduct of BOP employees under the law of the place where the acts or omissions occurred.

10. For these violations, Rodriguez seeks nominal and compensatory damages, attorneys' fees and costs, and any other relief that the Court deems appropriate.

## JURISDICTION AND VENUE

11. Rodriguez's claims arise under the FTCA; thus, the Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(b).

12. Rodriguez resides in this District and asserts claims against the United States

2

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

under the FTCA; thus, venue is proper in this District under 28 U.S.C. §§ 1391(e)(1) and 1402(b).

**INTRADISTRICT ASSIGNMENT**

13.    Pursuant to Civil Local Rule 3-2(d), Rodriguez's action is properly assigned to the San Francisco Division of this District because a substantial part of the events or omissions which give rise to the claim occurred in San Francisco county, where Rodriguez resides.

**PARTIES**

14.    Plaintiff Angelo Victor Rodriguez is an individual and citizen of San Francisco. During the relevant period, Rodriguez was incarcerated at various BOP facilities.  Rodriguez has now finished his term of imprisonment and again resides in San Francisco.

15.    Defendant United States of America is a governmental entity and is sued under the FTCA for the tortious acts and omissions of its employees.

16.    Unless otherwise noted, all federal employees referenced in this First Amended Complaint—including but not limited to:  Beth Zalno, PA-C; Michaeleen Powanda, PA; Dr. Thomas Cullen, D.O.; Assistant Health Services Administrator Ryan Parkyn; Warden Catricia L. Howard; Unit Manager Kathleen Gower; Felicitas Fandreyer, FNP; Philip Kapatos, PT/DPT; and Dr. Berhan Yeh, MD/CD—were at all relevant times employees of defendant United States, working within the scope and course of their employment with BOP and under circumstances where the United States, if a private person, would be liable to Rodriguez in accordance with the law of the place where the acts or omissions occurred.  *See* 28 U.S.C. § 1346(b).

**FACTUAL ALLEGATIONS**

**A.    Rodriguez Is Paralyzed in a Shooting Prior to Incarceration.**

17.    Angelo Victor Rodriguez was born in San Francisco on February 21, 1992 to Suzanne Zelaya and Victor Rodriguez.  Rodriguez's parents divorced when he was young and Zelaya assumed primary responsibility for raising him and his brother, Anthony.  Victor Rodriguez was largely absent from his sons' lives following the split.

18.    Angelo Rodriguez nevertheless enjoyed a happy childhood.  He excelled in his youth at football and track.  He was an avid artist and drummer.  At Downtown High School, Rodriguez received As and Bs and dreamed of joining the Army.  Unfortunately, Rodriguez

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

became involved at an early age in the Norteño street gang, which often recruited youths in the neighborhood where he grew up.  He was arrested several times before turning 18.

19.     In November 2010, as he was walking down the street in the Mission neighborhood of San Francisco, Rodriguez was approached by several gunmen and shot twice in the chest.  As he attempted to escape, his assailants shot at him at least twice more.  Rodriguez was taken to the hospital, where he spent more than two weeks in a coma.  When he awoke, Rodriguez learned that he had become paralyzed from the waist down.  He had sustained T8/T9 vertebral body fractures with a bullet fragment lodged in the T9 canal, a rib fracture, and a sternal fracture, requiring multiple surgeries including a T6-T12 fusion.  Rodriguez was ultimately forced to spend two months, beginning in early December 2010, at a rehabilitation center.

**B.     With the Help of Physical Therapy, Rodriguez Regains Independence.**

20.     The years that followed were difficult for Rodriguez.  His drastically altered physical condition required figuring out how to use a wheelchair and relearning basic skills like how to bathe and go to the bathroom.  He quickly had to learn how to exercise and stretch his lower body to avoid additional lasting health challenges.  Rodriguez's new normal necessitated constant care, including physical therapy, from health workers and family.  Moreover, especially because his assailants were never caught or even identified, Rodriguez suffered from severe PTSD and required extensive mental health treatment.

21.     The work put in by Rodriguez—with the help of his family and health care professionals—paid dividends, and in the years following the shooting, Rodriguez, though paralyzed, had relatively normal range of motion in his legs.  Physical therapy, both informally on his own and, even more so, with the assistance of a trained professional, proved instrumental in stabilizing Rodriguez's condition and helping him to achieve a measure of independence. Maintaining an exercise and physical therapy regimen was particularly important for avoiding the painful pressure sores that developed frequently in the first years after the injury and reducing spasms that likewise often plague paraplegic individuals.

22.     Doctors thus consistently directed that Rodriguez stick with physical therapy and continue to exercise.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

23.    In April 2012, a physical therapist noted that Rodriguez

> appears far below the functional level expected for an individual at his age 2 years s/p thoracic SCI.  Patient will benefit from Physical Therapy to address independence with transfers and mobility and improve functional strength and flexibility.  Prognosis is fair to good as patient has demonstrated fair follow through with previous therapy programs though currently appears motivated to participate and make positive changes.

24.    A doctor at the Spinal Cord Wellness Clinic at Kaiser also saw Rodriguez in 2012, noting that he "has good range of motion passively at the hips bilaterally, knees bilaterally within normal limits.  Bilat ankle, he is lacking maybe 3 degrees dorsiflexion to neutral, plantar flexion within normal limits."  To maintain his condition, the doctor directed Rodriguez to use a standing frame and complete range-of-motion exercises and stretching with the assistance of a physical therapist.

25.    Later care providers echoed the same advice.  For example, in an email exchange from January 2013, Mr. Rodriguez's physical therapist wrote, "I recommend daily range of motion and daily use of the standing frame to help reduce his spasms and improve flexibility and positioning. . . .  These recommendations are in agreement with the same range of motion recommendations made by [Kaiser]."  Similarly, in February 2013, Rodriguez's doctor observed that "[h]is caregiver does do daily stretching exercises 15 minutes three times a day with the patient three times a day.  When he does not do this then his spasms worsen and his range of mobility declines."

26.    In April 2013, Rodriguez's doctor noted that he was hoping to drive with hand assistance; was doing much better; was "[m]otivated" and "[h]as direction"; was "[a]voiding unfavorable social situations"; and "[h]oping to do welding job and pursue his art."  He elaborated: "Angelo is doing really well.  He is motivated.  His spirits are good.  His is transferring himself.  He has career aspirations.  Applauded all of this."

27.    Medical notes from April 2013 likewise reflect that Rodriguez had, at the time, maintained "good range of motion passively at the hips bilaterally, knees bilaterally but very tight.  At the ankles, he is lacking a few degrees maybe 3-5 dorsiflexion to neutral bilaterally."  The notes also reflect that the doctors "encourage[d] him to do a range of motion stretching

FIRST AMENDED COMPLAINT

program, because he is very tight in his knees" and observed that he was receiving assistance from others to complete his exercises: "His primary caregiver is his brother Anthony. He also has 148 hours a month of attendant care."

28. Rodriguez's improvement was not always steady, but when his condition worsened, physical therapy and guided exercises proved invaluable. In January 2015, for instance, notes from Kaiser Vallejo reflect that Rodriguez sought assistance for "decreased range of motion (ROM), decreased muscle length, joint immobility and pain," which was "causing an impaired functional ability to change body position." Kaiser recommended a 12-week program wherein Rodriguez visited the facility once a week for manual therapy and therapeutic exercise, among other services. At the end of the year, follow up notes stated: "Angelo is doing great. Driving, transferring, working at [S.F.G.H.] counseling kids in violent injuries."

29. Likewise, in February 2016, Rodriguez reported to his physician that he was suffering from severe, painful spasms in his legs. The notes reflect that to mitigate the tightness and spasticity, he was completing physical therapy. Rodriguez's brother, Anthony, assisted with his daily exercises, stretching, and transfers to a standing frame that he used to mitigate atrophy.

30. In March 2016, a physician's assistant observed that Rodriguez was doing "very well," was "[s]elf sufficient," and "[g]oing to school."

**C.      Rodriguez Is Arrested and Sentenced to 41 Months in Custody.**

31. Rodriguez was arrested in October 2016 and charged with a single count of 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm.

32. Rodriguez pleaded guilty before Judge Orrick on April 20, 2017. In doing so, Rodriguez offered a statement accepting responsibility for his actions, explaining in part:

> I should not have carried or possessed a firearm. My offense comes from fear. I live in fear because of my PSTD disorder. I can never forget the day I was shot. The people who shot me made several attempts to finish me off. I felt that was the only way to feel safe and protect myself. I feel like I messed up and regret my actions.

33. Rodriguez was ultimately sentenced in August 2017 to 41 months in prison followed by three years of supervised release.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

34. In the months prior to being taken into custody, Rodriguez's doctor observed that he was "[d]oing well"; "[e]xercising"; "[t]ransferring well"; had "[n]o ulcers"; "[n]o problems with self cath"; [g]etting good grades." A nurse wrote that she had had a "[v]ery pleasant" visit with Rodriguez, who she said was "[i]ndependent with all ADL's and needs assistance with iADLs." Rodriguez's nurse also observed that he "[a]ctively participates in physical therapy or home exercise program."

**D. Moved Frequently Among Facilities, Rodriguez Is Denied Care Critical to His Health as a Paraplegic.**

**1. Rodriguez Informs BOP of His Treatment Needs.**

35. In the months after his sentencing, Rodriguez spent short stints in Santa Rita County Jail, Nevada Southern Detention Center, and Federal Transfer Center, Oklahoma City, before winding up at Federal Correctional Institution, El Reno ("FCI El Reno") in December 2017.

36. From the outset, it was made very clear to Rodriguez that he would have to fight for even the most basic of accommodations. Indeed, as he was transferred from the jail in Santa Rita into federal facilities, government personnel refused to aid Rodriguez in getting onto the airplane that would transport him, making him roll out of his wheelchair and scoot himself up a set of stairs and onto the plane with no assistance whatsoever. The officials purportedly responsible for Rodriguez's safety stood by idly and laughed as Rodriguez struggled. Rodriguez would later write: "I was humiliated and treated like an animal. I was made to crawl into the transport plane and crawl on the ground like a snake on to the bus. . . . The U.S. Marshals laughed and offered no assistance."

37. Nevertheless, from the start, Rodriguez was clear in communicating to the FCI El Reno staff the basic level of care required by someone in his condition. In a December 2017 inmate request to staff, Rodriguez explained:

> I need proper medical attention, I cant help or take care of myself. I need help in taking showers and bowl movements. At home I had a full time caregiver who helped me, and while in here I been suffering on a daily. The medical at this facility is not enough for my condition and needs. I need to be sent to a hospital,

7

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

home, or a medical facility that could provide the actual medical help and attention I need daily. I fear for my health, safety, body, and mental state. I need help. Im scared for myself in many ways due to my medical condition, and feel nobody is taking my needs into consiteration. I have rights and special needs that need to be met. Its not right for me and my needs to be placed here without adiquat help 24/7 for my needs. Can someone please help me, it could be a life threatening or critical situation for me.

Since being here I have not been seen by a doctor and put in the hole. I need my medications three time a day and over here all they do is two times a day. Im not getting full supplies I need at once to last me. I need a special bed and mattress to prevent sores and extra pillow to place between my legs to prevent sores as well. I need my legs streached on a daily to prevent atrophy and my legs from being locked unable to move and help with my blood circulation, without that it could cause me to get them amputated or further medical complications. I need help with taking showers and have bowl movements. This facility does not offer any of that to help me. My needs need to be taken into consideration as well as my safty. I been in extream pain with my hip replacements, they feel like one is out of place as well as pain the metal holding my spine in place feels bent from falling trying to use the bathroom on my own. I havent had a bowl movement in ten days, and been hurting and feeling sick. I need help and a proper place to be housed for my needs.[1]

38.     Rodriguez reiterated these points in conversations with doctors, and outside advocates with the Oklahoma Office of Disability Concerns also reminded the BOP early in Rodriguez's incarceration that he would require special care.

39.     As was often the case, however, Rodriguez's pleas for aid fell on deaf ears. In January 2018, Rodriguez began requesting to be transferred to a facility that could meet his needs. In a January 4, 2018, request, Rodriguez wrote:

I would like to be transferred to a medical hospital facility where I could get the right care, attention, supplies, and resources for my medical condition. Im a fully paralyzed person who has special daily needs, tasks, and help such as taking showers, cleaning up after bowl movements, leg exercises, physical therapy, and much more that I cant receive here in this facility. My health and body is important to me, I deserve to have the adiquit help I need. I fear for my safety and health. Its not human to let someone suffer without the proper medical attention Im entitled to receive. Could someone please help me and take my medical circumstances in to deep consideration, I cant take care of myself I need help.

---

[1] Quotations appear in the First Amended Complaint as they do in the original source, without alteration, except where explicitly shown, of any spelling or grammatical errors.

8

FIRST AMENDED COMPLAINT

40.    Rodriguez reiterated his demand on January 6, 2018 and January 7, 2018.  In the latter request, he again made clear that he needed regular assistance:

> I NEED TO GET MY LEGS STREACHED AT LEAST ONCE DAILY TO PREVENT FURTHER ATROPHY, AND FOR BLOOD FLOW SO I DON'T GET BLOOD CLOTS AND HAVE TO GET AMPUTATION.  I have a lot of needs and help on a daily.  Im not receiving and neglecting them.  If you cant help or provide me with all the help I need daily like leg exercises, my meds 3x a day, showering, cleaning after bowl movements, and more, the I would like to be sent to a hospital facility that can take proper care of my medical needs.

41.    BOP's lack of regard for Rodriguez's condition had exactly the effect of which Rodriguez had warned.  On January 12, 2018, Rodriguez informed facility staff that he "is having breakdown on both my legs"; medical personnel then reported that "inmate does have multiple open lesions on both legs on the dorsal aspect of the thighs.  Lesions range in size from pin pricks to pencil eraser size and several appear to be oozing."

42.    Eventually, on January 26, a doctor informed Rodriguez that he would be transferred and put in for a physical therapy evaluation.

**2.    Although Relocated to FCI Allenwood, Rodriguez Is Still Denied Care.**

43.    After months of delay, Rodriguez was finally transferred to FCI Allenwood in March 2018.  Upon arrival, he was examined by BOP medical practitioners Dr. Thomas Cullen, D.O. ("Cullen"), and Beth Zalno, PA-C ("Zalno").  Cullen recognized that Rodriguez would need to be monitored for wounds and ulcers.

44.    Eventually, Rodriguez was seen by an independent physical therapist, Susan Andrews, PT, MSPT ("Andrews"), on August 8, 2018.  Andrews prepared a summary of her encounter with Rodriguez that explained that he "report[ed] that since being incarcerated he has had difficulty carrying out all of his rehab independently, as much of it is very difficult or impossible to do without the assistance of a therapist for safety and/or skilled movement facilitation."  Rodriguez told Andrews that "the atrophy in his legs has advanced over the last year and he now has difficulty getting full knee extension, even passively.  His goal is to work his way up to safe and independent use of a walker for transfers, as he believes that this will significantly decrease his risk of falls and further injury during future transfers."  Andrews added

9
FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

that "[t]here is moderate atrophy through his legs."

45.     In her assessment, Andrews recognized that Rodriguez was "quite motivated to continue his efforts to regain more independent mobility, but is frustrated with the obstacles he faces currently in the absence of therapists to assist with rehab at consistent and regular intervals."  In Andrews' estimation, Rodriguez's "age and overall level of fitness, coupled with his motivation, create very high potential for success with increased safety for transfers, as well as increased independent mobility with the use of [Knee Ankle Foot Orthoses ("KAFOs")], provided that he is provided the opportunity for hands on and skilled rehab services (vs. independent exercise and rehab activities without the assistance or input of a trained, skilled therapist)."

46.     Andrews thus "suggest[ed] well-fitted KAFOs, and any very regular follow ups with fitting, as well as skilled, hands-on rehab," which she recognized "cannot be done in the FCI Allenwood setting with the current available services."  She further observed that "incarceration in a setting where these services are readily available might offer him the access to these services and ultimately increased mobility."  Physical therapy at Allenwood, on the other hand, was "not necessary or recommended at this point, as intermittent (1x/month) will not offer any long term benefit."

47.     Andrews forwarded her report to BOP.  A BOP Administrative Note stated that Andrews' "[f]indings were of the overall ability to rehabilitate physically with PT hand on guidance with KAFOs, properly fitted KAFOs, and ability to progress without these available is unlikely at ALM."  The BOP Administrative Note stated that Andrews' "recommendations also included transfer to a medical facility where [hands on and skilled rehab] services would be readily available and ultimately increase mobility."

48.     Furnished with Andrews' recommendation—which reiterated what Rodriguez had long known and communicated to BOP many times over—Rodriguez initiated the administrative grievance process to compel a transfer consistent with Andrews' guidance.  In an informal resolution form completed on August 13, 2018, Rodriguez explained that "Im being neglected by medical . . . by not receiving the proper daily medical care Im in need of" and that he required a transfer to obtain the care Andrews had prescribed.  "Im deteriorating slowly due to the neglect of

10

FIRST AMENDED COMPLAINT

my needs not being met," he wrote.

49. Rodriguez stated much the same in his subsequent Regional Administrative Remedy Appeal form, specifying that he needed to be housed in a "Care Level 4 FMC that can properly accommodate all my medical needs." And in an additional Request for Administrative Remedy, dated August 22, 2018, Rodriguez lamented that his transfer to a properly equipped medical center was taking so long, again reminding the prison staff that he was not receiving "needed equipment," such as a standing frame, recumbent bike, and leg braces, and certainly was not receiving the physical therapy he required.

50. Warden Catricia L. Howard ("Howard") denied Rodriguez's Request for Administrative Remedy on September 12, 2018, informing him that, following his August physical therapy evaluation, "a transfer request was submitted to Medical Designations, and is currently pending review and decision. Once a decision has been made by Medical Designations, you will be notified."

51. Despite Howard's reassurances, no decision was forthcoming. An appeal to the BOP Regional Director, J. Ray Ormond, had little apparent effect. Nor did submitting a Central Office Administrative Remedy Appeal on October 9, 2018 result in any meaningful change. Neither the services Rodriguez required, nor a transfer, followed.

52. Meanwhile, on September 26, 2018, Rodriguez reported to Zalno that he was having leg spasms. That same day, Zalno documented that Rodriguez "reports increased atrophy along with decreased range of motion in lower extremities since incarceration" and ordered a physiatrist examination "to determine if he has a complete or incomplete spinal cord injury and to determine if he has any potential or need from physical or occupational therapy."

53. On October 24, 2018, Dr. Melissa Michaluk ("Michaluk"), an independent doctor specializing in physical medicine and rehabilitation at the UPMC Susquehanna specialty spinal cord injury clinic, conducted a physical examination of Rodriguez.

54. Michaluk added to the growing chorus of healthcare professionals who had observed that Rodriguez was not receiving the basic care his condition mandated.

55. In recounting the physical challenges Rodriguez had faced, Michaluk observed

FIRST AMENDED COMPLAINT

that "[p]atient also has complications of spasticity that have been greatly improved with the use of a standing frame on a daily basis." She recounted that "[w]ithin time after his initial spinal cord injury, he became motivated to where he did physical therapy and occupational therapy on a daily basis."

56.    Michaluk then explained that Rodriguez "has noticed since his imprisonment in the Allenwood federal prison, he has lost significant range of motion of the lower extremities, and has gained quite a bit of spasticity secondary to lack of therapies. In addition, because he is not able to stand in a standing frame on a daily basis he is experiencing increasing neuropathic pain in the lower extremities."

57.    In her assessment and plan, Michaluk wrote that, *before* his incarceration, Rodriguez "had ample access to therapeutic equipment, a standing frame, wheelchair vendors, and a gym." But, by the time of her examination, Rodriguez was "experiencing worsening spasticity and tightness due to lack of movement, range of motion, and stretching.  If patient could have access to these services, his risk for worsening spasticity, nerve pain, and permanent loss of the ability to stand would decrease significantly." Michaluk added that, "[i]f patient had access to a standing frame where he would be able to stand and stretch for at least 30 minutes daily, his neuropathic pain would decrease significantly." Cullen subsequently reviewed Michaluk's assessment.

58.    Finally, in November 2018, after yet another request by Rodriguez, BOP's Administrator of National Inmate Appeals provided a response to his Central Office Administrative Remedy Appeal, stating that he had been approved for transfer to a facility for "continuation" of his medical care.

### 3.    Rodriguez Is Transferred to FMC Devens, but Care Does Not Improve.

59.    Rodriguez arrived at FMC Devens in December 2018.  FMC Devens is a Care Level 4 facility.

60.    Rodriguez was immediately placed in the SHU for 23 hours per day and given no indication of when he would be moved to the general population.  Rodriguez's placement in the

SHU was for no fault of his own:  Unbeknownst to Rodriguez until his arrival at the facility, the inmate population at FMC Devens was dominated by members of a gang that rivaled the gang to which Rodriguez had once belonged.

61.     Rodriguez's cell in the SHU was not handicap-accessible.  The only available bathroom to Rodriguez was not equipped for wheelchair use.  Rodriguez fell repeatedly while trying to use the toilet.  Rodriguez was unable to use the shower at all and was thus forced to go months without showering.

62.     Rodriguez asked his unit manager, BOP employee Kathleen Gower ("Gower"), to be moved to a handicap-accessible cell.  Rodriguez repeatedly told Gower that he needed a shower, but Gower informed him that no handicap-accessible cell was available for his use.

63.     Rodriguez was denied physical therapy and access to exercise equipment while housed in the SHU.  Because of the size of his cell, Rodriguez was unable to stretch or perform exercises that had been a part of his regular regimen, including upper body strengthening exercises.

64.     Rodriguez grew progressively more anxious and frustrated about his housing placement.  By December 29, 2018, prison records noted that "Inmate is pending transfer to another facility commensurate with his security and housing needs," but it would be months before a transfer in fact took place.

65.     Rodriguez, who has struggled with PTSD and depression, begged to leave the SHU.  In a handwritten note of early January 2019, he "request[ed] to get my care level dropped to a '3' or '2' please[,]" abandoning his long-sought-after physical therapy request, because

> [i]t ma[de] no sense having me at a medical center if Im not able to be on the compound. . . .  Im not trying to be stuck in the SHU, Im trying to be at a facility that I can be at in general population and stay busy.  Its unhealthy to keep me back here in my mental state of mind for no reason.  Its clearly a form of abuse and neglect.  Im not in trouble, so I should not have to be treated like I am. . . . please help me get to a facility that I can be at. . . . Its not right or fair Im being held in the SHU.  When can I get out of here?  How much longer?  I truly cant take it no more, please help me.

66.     Rodriguez's urgent pleas and request to drop his care level were still not enough.  Rather, BOP medical practitioner Felicitas Fandreyer, FNP ("Fandreyer"), told him that unless he

13

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

waived his right to medical treatment—specifically, physical therapy for rehabilitation—he would remain in isolation.  Desperate and in deteriorating physical and mental health, on January 4, 2019, Rodriguez signed the waiver form.  The waiver was also signed by Fandreyer.

67.     On January 8, 2019, growing increasingly distressed, Rodriguez penned a handwritten "Cop Out" imploring the prison to drop his care level so that he could be moved to a different facility.  He wrote: "I just want to get out of the SHU ASAP."  Rodriguez communicated the same to Fandreyer a day later, telling her, "I'm going to lose it."

68.     On January 14, 2019, BOP medical practitioner Dr. Berhan Yeh, MD/CD ("Yeh"), ordered an urgent physical therapy consult request.

69.     BOP medical practitioner Philip Kapatos, PT/DPT ("Kapatos"), met with Rodriguez on January 16, 2019.

70.     Rodriguez told Kapatos he was experiencing "nearly constant mid-back pain" as well as "frequent LE muscle spasms," attributing much of his decline to his time in the SHU.

71.     Rodriguez also told Kapatos that he still wanted and needed medical treatment, including physical therapy, but had signed the waiver form because he believed that was the only way he could get out of the SHU.

72.     Nevertheless, Kapatos' report opined that Rodriguez "does not want PT treatment" and concluded "[n]o ongoing skilled PT is required."  Yeh reviewed Kapatos' report on January 17, 2019.

73.     Yeh completed a Medical Discharge Summary on January 17, 2019.  Yeh explained that, "[p]rior to his incarceration, [Rodriguez] reports that he had been going to a PT clinic, not necessarily for ongoing PT treatment, but rather to use the exercise equipment . . . .  He was sent to FMC Devens for PT evaluation and assessment for possible PT and Rehab from his spinal injury."  Yeh then reported that Rodriguez had arrived at FMC Devens on December 6, 2018, but that for "security reasons," Rodriguez "has been housed in the SHU since his arrival."  Yeh asserted that "[t]here is no indication for PT given [Rodriguez's] absent prognosis for returning to functional ambulation," suggesting instead that Rodriguez "[c]ontinue with home exercises to maintain conditioning and function."

14
FIRST AMENDED COMPLAINT

74. All the while, Rodriguez continued to struggle. On January 21, 2019, Rodriguez reported that he had fallen while trying to transfer from the bed to his wheelchair and was experiencing pain in his back.

75. Rodriguez prepared a Compassionate Release Request on January 30, 2019. He wrote that he had "been transferred to 8 different BOP facilities in 485 days and I have yet to receive the assured care for my health from any of these facilities." He added:

> The continuous medical neglect, mistreatment, my life has been placed at risk, non wheelchair accessibility environment and failure to care for a paraplegic. As of 1/18/19, it has been 487 days without receiving any physical therapy. I have not showered since my arrival at FMC Deven (12/6/18). Atrophy has begun to set in to the bones of my legs, which causes excruciating pain throughout my body. Atrophy is irreversible.

76. Rodriguez explained that, while the prison system may have thought he was being transferred for surgery, "[m]y transfer to FMC Deven is for physical therapy. I finally reached a Federal Medical Center and I am immediately housed in the SHU. You cannot even imagine my frustration and disappointment in the BOP system. My journey has been too long and painful to be denied medical care."

77. As for the withdrawal of his request for physical therapy, Rodriguez wrote that:

> I also was made or manipulated to sign a form to cancel my desperately needed physical therapy. . . . I have no concept of time or date, but a woman's voice informed me to sign the cancellation form for physical therapy, in order lower my care level. By doing so, it will get me transferred to another facility. She stated only inmates in the medical unit can receive physical therapy, [redacted]. I physical can no longer endure the pain of atrophy or be neglected at another facility. I am a human being with a disability with daily needs to survive.

78. With Rodriguez's claim to physical therapy "withdrawn," he was cleared to be transferred. Even after executing the waiver in early January 2019, however, Rodriguez—inexplicably—languished in the SHU at FMC Devens for two more months. BOP again avoided providing Rodriguez the care he needed and instead passed the buck to Rodriguez's next stop.

### 4. Rodriguez's Health Deteriorates upon His Return to Allenwood.

79. Rodriguez was transferred back to FCI Allenwood in March 2019.

80. Rodriguez again requested compassionate release on March 21, 2019.

81. A March 25, 2019 report from Cullen claimed that Rodriguez would not require

KEKER\4333\ANGELO\1623953.v2-1/14/21

physical therapy based on the fact that FMC Devens had purportedly so concluded—ignoring entirely what had happened to Rodriguez while housed there.  Cullen either ignored or chose not to find out what had actually occurred.

82.     Denying Rodriguez's compassionate release request on April 2, 2019, Howard wrote that "the Health Services personnel have confirmed that though you are a paraplegic, you continue to independently perform activities of daily living."  She continued:

> A review of your medical file indicates that you were released from FMC Devens due to your documented refusal to participate in Physical Therapy.  This refusal was documented on January 4, 2019, and signed by the health care providers and you.  On January 16, 2019, the FMC Devens Physical Therapist examined you. The results of this examination was reviewed by the Physical Therapist and the attending physician.  You were determined to be completely independent with all Activities of Daily Living (ADL's).  . . .  There is no indication for additional Physical Therapy given your absent prognosis for returning to functional ambulation.  All your chronic impairments are stable and can be managed through basic self performed home exercises.  There is nothing in your medical records indicating your affiliation with a gang affiliation influenced your medical plan as you suggest.

83.     Although Rodriguez's condition continued to deteriorate through the latter half of 2019, with pain returning and mobility declining, BOP continued to whitewash its failure to provide Rodriguez with the basic care he needed.

84.     For example, Rodriguez was seen on November 5, 2019 by Andrews, the independent physical therapist who had previously concluded that he required physical therapy, only this time she did an about-face.  Andrews recognized that Rodriguez "[r]eports that since returning to FCI Allenwood, the spasms in his legs have progressed, and frequently cause his legs to lock in an extended position when he is attempting to transfer.  . . .  This makes transfers into bed difficult, but also makes transfers into and out of the shower difficult.  Morning ADLs are often slowed and interrupted by more significant spasms . . . ."

85.     Yet Andrews concluded that "[e]ven without any significant hands-on or skilled therapy services at FMC Devens, Mr. Rodriguez's overall status has changed very little since my first encounter with him, indicating a level of stability with the chronic issues related to his SCI."

86.     BOP continued its refusal to authorize physical therapy and equipment, and it failed to provide sufficient medical care as Rodriguez's health declined.  Through the fall of

FIRST AMENDED COMPLAINT

2019, Rodriguez's contractures worsened, and his bedsores became infected.

87. Throughout Rodriguez's second stint at Allenwood, he and his mother repeatedly raised their concerns over the care Rodriguez was receiving (or lack thereof) with BOP employee Ryan Parkyn ("Parkyn"), an Assistant Health Services Administrator. Though empowered to address Rodriguez's concerns, Parkyn failed to act appropriately, delaying and/or denying repeated requests for necessary durable medical equipment and physical therapy.

88. Additionally, Rodriguez showed his infected bedsore to BOP medical practitioner Michaeleen Powanda, PA ("Powanda"), who dismissed it as trivial. Powanda refused to seek an evaluation of a wound care specialist, and she refused to prescribe Rodriguez with antibiotics, even when Rodriguez's bedsore reeked of a pungent odor.

89. Prison officials and employees, including at least Parkyn, Powanda, and Cullen, ignored Rodriguez's deteriorating state. Parkyn, in particular, assured Rodriguez's mother that Rodriguez was receiving adequate medical care for his bedsores, but failed to ensure that that was true.

90. FCI Allenwood medical staff did not adequately monitor Rodriguez's condition, used sink water to wash his wounds, and, most egregiously, never prescribed him antibiotics as he fell gravely ill.

91. FCI Allenwood personnel allowed Rodriguez's wound to fester through the end of his stay at the facility. As their counterparts at FMC Devens had done, the staff at FCI Allenwood chose to ignore Rodriguez's problems and leave them for his next caretakers, this time in San Francisco.

**E.    Rodriguez's Condition Worsens When He Returns to San Francisco.**

92. On January 14, 2020, Rodriguez left FCI Allenwood and reported to a halfway house in San Francisco to continue his term in BOP custody. The halfway house, however, *immediately* sent Rodriguez to the hospital due to his dire condition: A bacterial infection had hollowed a four-inch cutaneous lesion in Rodriguez's right thigh tissue, and he had developed life-threatening sepsis.

93. Upon arriving to Saint Francis Memorial Hospital, Rodriguez reported that "I have

17
FIRST AMENDED COMPLAINT

a pressure sore on the bottom of my right cheek for months, but now it's worse. I'm having chills, hot flashes, I've thrown up, and the color looks worse." The sore had been there for four months, oozing with greenish drainage. The hospital files reflected that "[p]atient has been seen by the prison in Pennsylvania medical provider but no antibiotics given. He says that he was only getting ABD pad. . . . Upon arrival patient is febrile, work up shows leukocytosis with left shift and elevated ESR."

94.     A physical examination conducted at the time revealed a right buttock decubitus ulcer that had become infected. Doctors noted that fixing the wound may require surgery.

95.     A surgeon had to clean out the sore, and Rodriguez was put on intravenous antibiotics for the next two weeks.

96.     Rodriguez was not discharged from Saint Francis until January 28, when he returned to the Central Gardens Nursing Facility, where Rodriguez stayed until he began a period of home confinement.

97.     Rodriguez's prison term ultimately concluded on July 6, 2020, and he was released from BOP custody on that date.

98.     Rodriguez's mobility has permanently declined as a result of BOP's failure to provide physical therapy or assistive equipment for over two years. Rodriguez faces the prospect of additional wound flap surgery to fix the ulcer that developed in early 2020. Rodriguez requires extensive continuing physical therapy to treat the injuries that developed and intensified under BOP's watch.

99.     Even upon his release from St. Francis, initially to Central Gardens and ultimately back to his family home, Rodriguez continued to struggle with his painful condition. His contractures have grown progressively worse and his atrophy has advanced. He can no longer straighten his legs the way he once could. Rodriguez suffers from heightened PTSD, depression, and anxiety.

## FEDERAL TORT CLAIMS ACT ADMINISTRATIVE EXHAUSTION

100.    Rodriguez's claims are asserted against defendant United States.

101.    Rodriguez has exhausted these claims against the United States under the FTCA.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

102.    Rodriguez presented a "Claim for Damages, Injury, or Death" to BOP on May 11, 2020 for BOP's "fail[ure] to provide medical care to treat or prevent worsening of [his] paraplegia" and the resulting "physical and mental injuries . . ., including:  decubit[u]s ulcers, bacterial infection, sepsis, muscular contractures, muscular atrophy, and mental and emotional distress," in the sum of $3,000,000.00 USD.

103.    A true and correct copy of Rodriguez's FTCA claim is attached hereto as **Exhibit A**.

104.    BOP received Rodriguez's administrative claim on May 11, 2020.  A true and correct copy of BOP's letter acknowledging receipt of Rodriguez's claim is attached hereto as **Exhibit B**.

105.    By November 11, 2020, six months after Rodriguez filed his administrative claim, BOP had neither accepted nor rejected the claim.  Pursuant to 28 U.S.C. § 2675(a), Rodriguez elects to consider BOP's failure to act as a final denial of his claim.

## CLAIMS FOR RELIEF

### CLAIM ONE
### NEGLIGENCE

106.    Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107.    Rodriguez brings this claim against the United States under the FTCA based on, but not limited to, the actions and/or omissions of Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, and Parkyn taken while working in their capacity as employees of BOP and acting within the scope of their employment, with the permission and consent of the United States.

108.    At all material times, Rodriguez was an inmate in the custody of BOP, a federal agency of the United States in possession and control of FCI Allenwood and FMC Devens.

109.    **Duty.**  Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn, and other BOP personnel had a custodial duty to protect inmates incarcerated by the United States from foreseeable harm, including, but not limited to, harm from denial of essential

19

FIRST AMENDED COMPLAINT

medical treatment.

110.    Alternatively, Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn, and other BOP personnel had a general duty of care to Rodriguez.

111.    The harms suffered by Rodriguez were reasonably foreseeable to Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn, and other BOP personnel because they knew, or in the exercise of due care should have known, that Rodriguez's paraplegia required medical treatment.

112.    **Breach of duty—failure to provide Rodriguez essential medical treatment during his first stint at FCI Allenwood.**  Throughout Rodriguez's first stint at FCI Allenwood, from March to December 2018, Cullen, Zalno, Howard, and other BOP personnel repeatedly ignored or refused Rodriguez's requests for medical treatment, despite Rodriguez having received multiple medical recommendations—including while he was in BOP custody—for such treatment.

113.    Cullen, Zalno, Howard, and other BOP personnel knew or should have known that denying Rodriguez medical treatment would have debilitating effects on him, particularly because by this point his BOP medical file reflected as much:  When he was denied care while in custody at FCI El Reno, Rodriguez developed open lesions on both legs, some of which were as large as "pencil eraser size" and several that oozed.

114.    Cullen, Zalno, Howard, and other BOP personnel did not take reasonable steps to ensure that Rodriguez had access to medical treatment.  Even after Andrews provided BOP with her report and recommendation in August 2018, noting that FCI Allenwood did not have the resources or services Rodriguez's condition required, it was not until four months later, in December 2018, that Rodriguez was transferred to FMC Devens.

115.    Rodriguez's injuries—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, and his advancing atrophy—were the direct and proximate result of this negligence of Cullen, Zalno, Howard, and other BOP personnel.

116.    **Breach of duty—sending Rodriguez to FMC Devens.**  BOP personnel responsible for Rodriguez's transfer to FMC Devens knew, or in the exercise of due care should

20

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

have known, that the purpose of Rodriguez's transfer out of FCI Allenwood was to permit him access to medical treatment for his paraplegia, and that such treatment would not be available to him in the SHU.

117.    BOP personnel responsible for Rodriguez's transfer to FMC Devens knew or, in the exercise of due care, should have known, that FMC Devens was dominated by members of a gang that rivaled the gang to which Rodriguez had once belonged, and that Rodriguez's transfer to that facility would result in him being placed in the SHU.

118.    The harms suffered by Rodriguez— including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, and his advancing atrophy—were the direct and proximate result of this negligence of BOP personnel.

119.    **Breach of duty—failure to provide Rodriguez access to essential medical treatment at FMC Devens.** Throughout Rodriguez's time at FMC Devens, Gower, Fandreyer, Yeh, Kapatos, and other BOP personnel repeatedly ignored or refused his requests for medical treatment, despite Rodriguez having received multiple medical recommendations—including while he was in BOP custody—for such treatment, and despite BOP approving his transfer to FMC Devens for the express purpose of providing him access to such treatment.

120.    Gower, Fandreyer, Yeh, Kapatos, and other BOP personnel did not take reasonable steps to ensure that Rodriguez had the ability to stretch or exercise, as required to prevent atrophy, or that he had access to medical treatment that his condition required.

121.    Gower, Fandreyer, Yeh, Kapatos, and other relevant BOP personnel knew or should have known that denying Rodriguez access to medical treatment would have debilitating effects on him, particularly because his BOP medical file reflected as much.

122.    The harms suffered by Rodriguez— including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, and his advancing atrophy—were the direct and proximate result of this negligence of Gower, Fandreyer, Yeh, Kapatos, and other BOP personnel.

123.    **Breach of duty—coercing Rodriguez to sign a waiver of his right to medical treatment in order to get out of the SHU and falsely documenting that Rodriguez did not**

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

**want or need physical therapy.** Fandreyer and Kapatos knew, or in the exercise of due care should have known, that Rodriguez—who has a history of PTSD and depression—was struggling psychologically with his prolonged solitary confinement at FMC Devens. Fandreyer and Kapatos also knew, or in the exercise of due care should have known, that Rodriguez's paraplegia required medical treatment, which he could not access while he was housed in the SHU.

124. Fandreyer breached her duty of care to Rodriguez by telling him that he would have to waive his right to medical treatment—specifically, physical therapy for rehabilitation—in order to get out of the SHU. The harms suffered by Rodriguez were reasonably foreseeable to Fandreyer because she knew or, in the exercise of due care, should have known, that by coercing Rodriguez to sign a waiver of his right to medical treatment, she was forcing Rodriguez to forego medical care that he needed.

125. Kapatos breached his duty of care to Rodriguez by reporting that Rodriguez did not want medical treatment. Kapatos knew that Rodriguez still wanted and needed physical therapy because Rodriguez told Kapatos as much, and that he only signed the waiver to get out of the SHU. The harms suffered by Rodriguez were reasonably foreseeable to Kapatos because Kapatos knew, or in the exercise of due care should have known, that by falsely reporting that Rodriguez did not want physical therapy treatment, Kapatos was denying Rodriguez the care his condition required.

126. The harms suffered by Rodriguez—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, his advancing atrophy, and the development of an infected bedsore and life-threatening sepsis—were the direct and proximate result of this negligence of Fandreyer and Kapatos.

127. **Breach of duty—failure to provide Rodriguez essential medical treatment during his second stint at FCI Allenwood.** Throughout Rodriguez's second stint at FCI Allenwood, from March 2019 to January 2020, Cullen, Howard, Parkyn, Powanda and other BOP personnel repeatedly ignored or refused Rodriguez's requests for medical treatment, despite Rodriguez having received multiple medical recommendations—including while he was in BOP custody—for such treatment.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

128. Cullen and Howard breached their duty of care by failing to investigate the circumstances surrounding Rodriguez's about-face "waiver" of his right to medical treatment. Cullen and Howard knew, or in the exercise of due care should have known, that Rodriguez did not voluntarily waive his right to medical treatment and thus still required treatment, including physical therapy and access to durable medical equipment.

129. Parkyn breached his duty of care by assuring Rodriguez's mother that Rodriguez was receiving adequate medical care for his bedsores but failing to ensure that was true.

130. Powanda breached her duty of care by dismissing Rodriguez's infected bedsore as trivial, refusing to seek an evaluation of a wound care specialist, and refusing to prescribe him with antibiotics, even when the bedsore reeked of a pungent odor.

131. FCI Allenwood personnel breached their duty of care by using sink water to wash Rodriguez's wounds and denying him essential medication as he fell gravely ill.

132. The harms suffered by Rodriguez—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, his advancing atrophy, and the development of an infected bedsore and life-threatening sepsis—were the direct and proximate result of this negligence of Cullen, Howard, Parkyn, Powanda, and other relevant BOP personnel.

**CLAIM TWO**
**MEDICAL MALPRACTICE**

133. Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

134. Rodriguez brings this claim against the United States under the FTCA based on, but not limited to, the actions and/or omissions of Cullen, Zalno, Fandreyer, Yeh, Kapatos, and Powanda taken while working in their capacity as medical practitioners employed by BOP and acting within the scope of their employment, with the permission and consent of the United States.

135. At all material times, Rodriguez was an inmate in the custody of BOP, a federal agency of the United States in possession and control of FCI Allenwood and FMC Devens.

136. **Duty.** Cullen, Zalno, Fandreyer, Yeh, Kapatos, Powanda, and other BOP medical

23
FIRST AMENDED COMPLAINT

practitioners were at all relevant times medical practitioners who owed a special duty of care to Rodriguez, as their patient, to use such skill, prudence, and diligence as other members of the medical community commonly possess and exercise, and to follow generally accepted standards of care in treating Rodriguez's paraplegia.

137. **Breach of duty—failure of BOP medical practitioners to treat Rodriguez during his first stint at FCI Allenwood.** Medical professionals recognize that paraplegics like Rodriguez require access to certain medical equipment and physical therapy, or else they face the prospect of bedsores, contractures, and atrophy.

138. Cullen, Zalno, and other BOP medical practitioners knew, or in the exercise of due care should have known, that Rodriguez was a paraplegic and required urgent access to physical therapy and durable equipment.

139. Since Rodriguez began his term of imprisonment with BOP, he both informed BOP of his medical needs and repeatedly requested access to physical therapy and durable medical equipment for his rehabilitation. Rodriguez's BOP medical file documented that when he was denied care while in custody at FCI El Reno, he had developed open lesions on both legs, some of which were as large as "pencil eraser size" and several that oozed.

140. Andrews' August 2018 report and recommendation to BOP noted that, since his incarceration, Rodriguez was having difficulty carrying out his physical therapy independently, and that the atrophy in his legs had advanced and he was having trouble getting full knee extension. Andrews opined that with the proper equipment and physical therapy, there was a "very high potential for success with increased safety for transfers, as well as increased independent mobility with the use of" KAFOs.

141. Michaluk's October 2018 assessment of Rodriguez, which was reviewed by Cullen, noted that, since his incarceration, Rodriguez was "experiencing worsening spasticity and tightness due to lack of movement, range of motion, and stretching," and that if Rodriguez had access to a standing frame for just 30 minutes a day, "his neuropathic pain would decrease significantly."

142. Yet, even when furnished with Andrews' report and recommendation and

FIRST AMENDED COMPLAINT

Michaluk's assessment (in addition to the rest of Rodriguez's BOP medical file), and despite Rodriguez informing BOP that he was "deteriorating slowly" and Zalno documenting that Rodriguez had reported "increased atrophy along with decreased range of motion in lower extremities," Cullen, Zalno, and other BOP medical practitioners failed to provide Rodriguez access to the treatment he required, instead leaving him to further languish and deteriorate at FCI Allenwood until December 2018, when he was finally transferred to a BOP medical facility.

143.    Cullen, Zalno, and other BOP medical practitioners' actions, or lack thereof, fell below the knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances.

144.    The harms suffered by Rodriguez—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, and his advancing atrophy—were the direct and proximate result of this medical malpractice of Cullen, Zalno, and other BOP medical practitioners.

145.    **Breach of duty—coercing Rodriguez to sign a waiver of his right to medical treatment in order to get out of the SHU and falsely documenting that Rodriguez did not want or need physical therapy.**  Fandreyer and Kapatos knew, or in the exercise of due care should have known, that Rodriguez—who has a history of PTSD and depression—was struggling psychologically with his prolonged solitary confinement at FMC Devens.  Fandreyer and Kapatos also knew, or in the exercise of due care should have known, that Rodriguez's paraplegia required access to medical treatment, which he did not have in the SHU.

146.    Fandreyer breached her duty of care to Rodriguez by telling him that he would have to waive his right to medical treatment—specifically, physical therapy for rehabilitation—in order to get out of the SHU.  The harms suffered by Rodriguez were reasonably foreseeable to Fandreyer because she knew, or in the exercise of due care should have known, that by coercing Rodriguez to a sign a waiver of his right to medical treatment, she was denying Rodriguez access to necessary medical care.

147.    Kapatos breached his duty of care to Rodriguez by falsely reporting that Rodriguez did not want physical therapy treatment.  Kapatos knew that Rodriguez still wanted and needed

25

FIRST AMENDED COMPLAINT

physical therapy because Rodriguez told Kapatos as much, and that he only signed the waiver to get out of the SHU.  The harms suffered by Rodriguez were reasonably foreseeable to Kapatos because Kapatos knew, or in the exercise of due care should have known, that by falsely reporting that Rodriguez did not want physical therapy treatment, Kapatos was denying Rodriguez access to necessary medical care.

148.    Fandreyer and Kapatos's actions fell below the knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances.

149.    The harms suffered by Rodriguez—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, his advancing atrophy, and the development of an infected bedsore and life-threatening sepsis—were the direct and proximate result of this medical malpractice of Fandreyer and Kapatos.

150.    **Breach of duty—failure of BOP medical practitioners to treat Rodriguez during his second stint at FCI Allenwood.**  Medical professionals recognize that paraplegics like Rodriguez require access to certain medical equipment and physical therapy, or else they face a high risk of bedsores, contractures, and atrophy.  Medical professionals also recognize that an infected bedsore requires medical treatment, or else it may cause long-term damage to muscle tissue and bone.

151.    Cullen, Powanda, and other BOP medical practitioners knew, or in the exercise of due care should have known, that Rodriguez was a paraplegic and required access to physical therapy and durable equipment.  Cullen, Powanda, and other BOP medical practitioners knew, or in the exercise of due care should have known, that Rodriguez's bedsore infection required medical treatment.

152.    Cullen breached his duty of care to Rodriguez by concluding that Rodriguez did not require physical therapy upon his return to FCI Allenwood.  Cullen did not conduct his own examination of Rodriguez to support his conclusion despite:  (1) knowing Rodriguez was initially transferred out of FCI Allenwood because Medical Designations had approved his transfer based on Rodriguez's need for medical care; (2) previously recognizing that Rodriguez would need to be monitored for wounds and ulcers; and (3) previously learning from Michaluk—a doctor

FIRST AMENDED COMPLAINT

specializing in physical medicine and rehabilitation—that Rodriguez required access to physical therapy and durable medical equipment.

153.    Powanda breached her duty of care to Rodriguez by dismissing Rodriguez's infected bedsore as trivial, refusing to seek an evaluation by a wound care specialist, and refusing to prescribe him with antibiotics.

154.    Cullen and Powanda's actions fell below the knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances.  Indeed, when Rodriguez was transferred out of FCI Allenwood in January 2020 and arrived at a halfway house in San Francisco to continue his term in BOP custody, the halfway house *immediately* sent him to the hospital due to his dire condition.  Upon arrival at the hospital, Rodriguez reported that he had "a pressure sore on the bottom of [his] right cheek for months, but now it's worse."  The sore had been there for four months and was oozing with greenish drainage.  A physical examination conducted by the hospital revealed a right buttock decubitus ulcer that had become infected, and doctors noted that fixing the wound may require surgery.  A surgeon had to clean out the bedsore, and Rodriguez was put on intravenous antibiotics for the next two weeks.

155.    The harms suffered by Rodriguez—including, but not limited to, severe mental and emotional anxiety and distress, his worsening contractures, his advancing atrophy, and the development of an infected bedsore and life-threatening sepsis—were the direct and proximate result of this medical malpractice of Cullen and Powanda.

### CLAIM THREE
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

156.    Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

157.    Rodriguez brings this claim against the United States under the FTCA based on, but not limited to, the actions and/or omissions of Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, and Parkyn taken while working in their capacity as employees of BOP and acting within the scope of their employment, with the permission and consent of the United States.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

158.    At all material times, Rodriguez was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI Allenwood and FMC Devens.

159.    For the reasons stated above, Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn and other BOP personnel were negligent in treating Rodriguez's paraplegia and/or ensuring that he had access to medical treatment.

160.    As a result of Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn and other BOP personnel's negligence, Rodriguez's contractures have progressively worsened and his atrophy has advanced.

161.    Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn and other BOP personnel's actions and/or omissions caused Rodriguez to suffer, and continue to suffer, serious and severe emotion distress including, but not limited to, heightened PTSD, depression, and anxiety, as a result of his contractures progressively worsening and his atrophy advancing.

162.    Rodriguez's emotional reaction was not and is not an abnormal response to the medical treatment (or lack thereof) that he received while in BOP custody.  A reasonable paraplegic person, already suffering from PTSD, would be unable to cope with the severe emotional distress caused by being repeatedly denied necessary medical treatment, having to experience their physical abilities—that they fought to regain after becoming paraplegic—slowly deteriorate, and further being locked in the SHU after months of pleading for medical care necessary for their wellbeing.  Rodriguez's distress was and is of such a substantial and enduring quality that no reasonable person in a civilized society should be expected to endure it.

163.    By reason of the United States' negligent infliction of emotional distress, through Cullen, Zalno, Howard, Gower, Fandreyer, Yeh, Kapatos, Powanda, Parkyn and other BOP personnel's conduct, Rodriguez has suffered severe emotional distress, and will continue to suffer severe mental and emotional anxiety and distress.

/////

/////

28

FIRST AMENDED COMPLAINT

## CLAIM FOUR
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

164.   Rodriguez repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

165.   Rodriguez brings this claim against the United States under the FTCA based on, but not limited to, the actions and/or omissions of Gower, Fandreyer, Kapatos, Powanda, and Parkyn taken while working in their capacity as employees of BOP and acting within the scope of their employment, with the permission and consent of the United States.

166.   At all material times, Rodriguez was an inmate in the custody of the BOP, a federal agency of the United States in possession and control of FCI Allenwood and FMC Devens.

167.   **Keeping Rodriguez in solitary confinement.**  Since Rodriguez began his term of imprisonment with BOP, he informed BOP of his medical needs and repeatedly requested medical treatment for his rehabilitation.  After a year of his urgent pleas falling on deaf ears, during which Rodriguez's condition continued to deteriorate, BOP finally transferred him to FMC Devens.  BOP personnel engaged in outrageous conduct when they put Rodriguez in the SHU immediately upon his arrival at FMC Devens—*for no fault of his own*.

168.   Rodriguez's placement in the SHU was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.  Rodriguez's SHU cell was not handicap-accessible, and the only bathroom available to him was not equipped for wheelchair use.  Rodriguez repeatedly fell while trying to use the toilet, and he was unable to use the shower at all and was therefore forced to go months without showering.  Because he was confined in the SHU, Rodriguez was also denied physical therapy and access to exercise equipment—the very purpose of his transfer to FMC Devens—and he was unable to stretch or exercise because of the size of the SHU cell.

169.   Gower engaged in outrageous conduct when she ignored Rodriguez's repeated requests to be moved to a handicap-accessible cell.

170.   In engaging in such extreme and outrageous conduct, Gower and the BOP

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

personnel responsible for assigning Rodriguez to the SHU had the intent to cause Rodriguez emotional harm, or they knew or should have known that emotional distress was the likely result of their conduct.

171. **Coercing Rodriguez to "choose" between leaving the SHU or his right to medical care.** Fandreyer engaged in outrageous conduct when she coerced Rodriguez—whom she knew, or in the exercise of due care should have known, was suffering from severe PTSD and depression while isolated in the SHU—to "choose" between signing a waiver of his right to medical treatment, or to remain in the SHU. Fandreyer's outrageous conduct laid the groundwork for BOP to continue to deny Rodriguez the care his paraplegia required, by claiming that Rodriguez had waived his right to physical therapy.

172. Fandreyer's conduct was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

173. In engaging in such extreme and outrageous conduct, Fandreyer had the intent to cause Rodriguez emotional harm, or she knew or should have known that emotional distress was the likely result of her conduct.

174. **Falsely reporting that Rodriguez "waived" his right to medical care.** Kapatos engaged in outrageous conduct when he falsely opined in his report that Rodriguez "does not want PT treatment." In fact, Rodriguez informed Kapatos that he was experiencing "nearly constant mid-back pain" and "frequent muscle spasms." Rodriguez also told Kapatos that he still wanted and needed physical therapy, and that he only signed the waiver form because he believed that was the only way he could get out of the SHU. Kapatos's outrageous conduct laid the groundwork for BOP to continue to deny Rodriguez the care his paraplegia required, by claiming that Rodriguez had waived his right to physical therapy.

175. Kapatos' conduct was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

176. In engaging in such extreme and outrageous conduct, Kapatos had the intent to cause Rodriguez emotional harm, or he knew or should have known that emotional distress was the likely result of his conduct.

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

177.    **Refusing to treat Rodriguez's infected wound.**  Powanda engaged in outrageous conduct by dismissing Rodriguez's infected bedsore as trivial, refusing to seek an evaluation of a wound care specialist, and refusing to prescribe him with antibiotics, even when Rodriguez's bedsore reeked of a pungent odor.

178.    Powanda's conduct was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

179.    In engaging in such extreme and outrageous conduct, Powanda had the intent to cause Rodriguez emotional harm, or she knew or should have known that emotional distress was the likely result of her conduct.

180.    **Ignoring Rodriguez's deteriorating state.**  Cullen, Powanda, and Parkyn engaged in outrageous conduct by ignoring Rodriguez's deteriorating state and failing to provide sufficient medical care as his health declined.  FCI Allenwood medical staff engaged in outrageous conduct by not adequately monitoring Rodriguez's condition, using sink water to wash his wounds, and never prescribing him antibiotics as he fell gravely ill.

181.    Cullen, Powanda, Parkyn, and the FCI Allenwood medical staff's conduct was beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized society.

182.    In engaging in such extreme and outrageous conduct, Cullen, Powanda, Parkyn, and FCI Allenwood medical staff had the intent to cause Rodriguez emotional harm, or they knew or should have known that emotional distress was the likely result of their conduct.

183.    **Injuries.**  As a result of this extreme and outrageous conduct, Rodriguez suffered severe emotional distress of such a substantial and enduring equality that no reasonable person in a civilized society should be expected to endure it.

184.    Rodriguez has suffered severe psychological and emotional anxiety and distress, and will continue to suffer severe mental and emotional anxiety and distress in the future.

## PRAYER FOR RELIEF

WHEREFORE, Rodriguez prays that this Court grant the following relief:

1.    Nominal damages in an amount to be determined at trial;

31

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

2.   Compensatory damages for violations of his personal dignity, physical injury, pain, discomfort, fears, anxiety, and other mental and emotional distress suffered by Rodriguez and for similar suffering reasonably certain to be experienced in the future, in an amount to be determined at trial;

3.   An award to Rodriguez of reasonable costs and fees; and,

4.   Such other and further relief as the Court may deem fit and proper.

Dated:  January 14, 2021                         KEKER, VAN NEST & PETERS LLP

By: _____
    R. ADAM LAURIDSEN
    BAILEY W. HEAPS
    CONNIE P. SUNG
    BILAL MALIK

    Attorneys for Plaintiff
    ANGELO VICTOR RODRIGUEZ

32
FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

## PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made.  I am over the age of eighteen years and not a party to the within action.  My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On January 14, 2021, I served the following document(s):

- **SUMMONS IN A CIVIL ACTION**

- **FIRST AMENDED COMPLAINT**

- **ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE AND ADR DEADLINES**

- **ECF REGISTRATION INFORMATON**

- **STANDING ORDER FOR ALL JUDGES OF THE NORTHERN DISTRICT OF CALIFORNIA**

- **GUIDELINES FOR TRIAL AND FINAL PRETRIAL CONFERENCE IN CIVIL BENCH CASES BEFORE THE HONORABLE WILLIAM ALSUP**

- **SUPPLEMENTAL ORDER TO ORDER SETTING INITIAL CASE MANAGEMENT CONFERENCE IN CIVIL CASES BEFORE JUDGE WILLIAM ALSUP**

☑  by **COURIER**, by placing Copy in a sealed envelope addressed as shown below, and dispatching a messenger from Nationwide Legal, Inc., whose address is 859 Harrison Street, San Francisco, CA  94107, with instructions to hand-carry the above and make delivery to the following during normal business hours, by leaving the package with the person whose name is shown or the person authorized to accept courier deliveries on behalf of the addressee.

David L. Anderson                                        **Via Courier**
United States Attorney
Sara Winslow, Chief, Civil Division
Pamela T. Johann
Assistant United States Attorney
450 Golden Gate Avenue, Box 36055
San Francisco, CA  94102-3495

☑  by regular **UNITED STATES CERTIFIED MAIL/RETURN RECEIPT REQUESTED** by placing a copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker, Van Nest & Peters LLP for collection and

33

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21

processing of correspondence for mailing. According to that practice, items are deposited with the United States Postal Service at San Francisco, California on that same day with postage thereon fully prepaid. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or the postage meter date is more than one day after the date of deposit for mailing stated in this affidavit.

Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Via Certified Mail/Return Receipt Requested**

Executed on January 14, 2021, at San Francisco, California.  I declare under penalty of perjury that the above is true and correct.

_____
Bryant L. Cavers

FIRST AMENDED COMPLAINT

KEKER\4333\ANGELO\1623953.v2-1/14/21